**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x
                                        :

ADSTRA, LLC,

                             :

                 Plaintiff,       :             Civil Action No. 24-CV-02639

                             :

             - against -        :           __**VERIFIED COMPLAINT**__

                             :

KINESSO, LLC and ACXIOM, LLC,

                             :

              Defendants.    :           __**JURY TRIAL DEMANDED**__

                             :

                             :
-------------------------------------------------------------- x

Plaintiff Adstra, LLC ("Adstra" or "Plaintiff"), by its attorneys, Aguilar Bentley LLC, as its complaint against Defendants Kinesso, LLC ("Kinesso") and Acxiom, LLC ("Acxiom") (together, "Defendants"), alleges as follows:

## THE PARTIES

1.      Adstra is a New Jersey limited liability company with its principal place of business at 750 College Road East, Princeton, New Jersey 08540.

2.      Defendant Kinesso is a Delaware limited liability company with its principal place of business at 100 West 33rd Street, New York, New York 10001.

3.      Defendant Acxiom is a Texas limited liability company with its principal place of business at 301 E. Dave Ward Dr., Conway, Arkansas 72032-7114 and an office located at 100 West 33rd St., New York, New York 10001.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case involves a question of federal law.

5.      This Court has supplemental jurisdiction over the claims not involving a federal question pursuant to 28 U.S.C. § 1367(a) because those claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this District, and as per the operative agreements in the matter, Defendants have consented to venue in this District.  In addition, a substantial part of the events or omissions giving rise to the claims in this action occurred in this District, and all Defendants regularly conduct business in this District.

## FACTUAL BACKGROUND

7.      This case arises out of Defendants' misconduct with respect to a data licensing agreement, whereby Defendants conspired to breach and/or cause others to breach that agreement and to assist Defendant Acxiom in its brazen misappropriation of trade secrets that were developed by Adstra so that Acxiom could unfairly compete with Adstra – one of its competitors in the omnichannel marketer business.

8.      Adstra serves its clients in the data and identity market by enabling them to identify and connect with their customers across media and technology.

9.      Adstra has built and owns an identity resolution product that enables it to provide the service of identity resolution to its customer base of "omnichannel marketers."

10.     Omnichannel marketers aim to create a convenient, seamless, and measurable user experience for consumers that offers many opportunities for fulfillment in contrast to traditional marketing, which aims to broadly raise brand awareness and promote brand image over the long term.

11.     Adstra (also known as ALC, LLC) licenses or provides certain data to its customers for the purpose of enabling them to build or enhance their own identity resolution product.

12.     In addition, Adstra sometimes enters into data processing agreements in order to provide data to certain other entities for the limited purpose of processing that data for use by Adstra's customers.

13.     Identity resolution enables brands to understand their consumers' behavior, facilitate targeted advertising to those consumers, and measure the effectiveness of that advertising.

14.     The data cultivated by Adstra, which is at issue in this action, consists of an enormous volume of flat files of data in four interconnected categories that Adstra has collected through proprietary methods, which safeguard individuals' privacy and ensure compliance with laws and industry standards relating to the collection of the following marketing data: (i) personally identifiable information ("PII") such as names and street addresses, (ii) raw log files including IP addresses and device data, (iii) mobile ad identifiers, and (iv) platform identifiers including DSP mapping schedules.

15.     The interconnection of all such information is referred to as the "spine" or "identity graph," which includes a "key" for each individual and household to which the various types of data correspond and link to devices through multiple advertising exchanges.

16.     Adstra's data is highly valuable to an entity that desires to build an identity resolution product, which would enable them to understand their consumers' behavior, facilitate targeted advertising to those consumers, and measure the effectiveness of that advertising.

17.     Kinesso is a media and marketing company that was formed by its parent company, Interpublic Group ("IPG") to unify the complex nature of a brand's media, data, audience, analytics, and creative architecture through its agency of record ("AOR") customers.

18.     An AOR is an agency that purchases advertising time and consults with a company to create effective media campaigns.  Under this model, a client agrees to hire only one agency, rather than multiple agencies, to help organize its advertising campaigns.

19.     Kinesso is not considered a competitor of Adstra's in that Adstra's customers are not AOR customers, but instead are omnichannel marketers.

20.     Acxiom is also a subsidiary that is owned by IPG, which, along with Kinesso, forms part of IPG's five major networks, including its marketing specialist network.

21.     On October 1, 2018, IPG purchased Acxiom Marketing Solutions (AMS) from LiveRamp. As a part of the transaction, LiveRamp transferred the Acxiom brand to IPG.

22.     Since LiveRamp's divestiture of the Acxiom business line to IPG, it is well known that Acxiom has been attempting to build for itself an identity resolution product for omnichannel marketers, i.e., a product that would directly compete with Adstra's product.

**Adstra Enters into the Master Data Supply Agreement with Kinesso in March 2020.**

23.     On March 3, 2020, Adstra and Kinesso entered into a Master Data Supply Agreement pursuant to which Adstra agreed to license and/or provide the ALC Data to Kinesso for the purpose of developing its own identity resolution product for its AOR customers, in addition to certain other limited uses, as set forth in detail in the schedules to the agreement (the "MDSA").  (Ex. 1.)

24.     Section 2.1 of the MDSA states as follows:

> Except as expressly provided otherwise in the applicable Schedule, ALC grants to Client a nonexclusive, nontransferable, perpetual, irrevocable (except in the event of termination by ALC for Client's

material default), world-wide, royalty-free (except for the fees
established in the applicable Schedule) right and license to use the
ALC Data subject to the terms of this Agreement and the Schedule.
ALC shall deliver the ALC Data to Client in accordance with the
Schedule.

25.    Section 3 of the MDSA is entitled "Permitted Uses of ALC Data" and provides in

Section 3.1 that:

Subject to any restrictions or specific requirements established in
the applicable Schedule, Client is permitted to use the ALC Data in
the development of products ("Client Products") that may be sold
or licensed to its customers . . .

26.    Schedule A to the MDSA provides more detail on the ways that Kinesso was

permitted to use the ALC Data.  Specifically, Section 1.1 of Schedule A (Offline and Online

Identity Files) provides:

Client is permitted to use the ALC Data to develop an Identity
Resolution Client Product for sale or license to Client's customers
("Third Party"), and not for the purposes of selling, reselling,
sublicensing, or otherwise providing such ALC Data *directly* to
Third Parties . . .

27.    The ALC Data is described in Schedule A, Attachment A of the MDSA as

"Linked2Me Identity Graph Products: (i) Terrestrial Identity Keyed Records; (ii) Identity

Linkage Data; and (iii) Digital Identity Graph."

28.    Schedule A to the MDSA further defines the "Permitted Uses," which includes

the development of an "Omnichannel Identity Resolution Client Product," "Providing Analytics

including profiling, segmentation, and modelling services to Third Parties, and the "Delivery,

facilitation and measurement of online and offline advertisements on behalf of Third Parties." It

further states that the "ALC Data can only be used for the purposes described above."

29.     The reason for the MDSA being drafted in this way, so as to restrict the use of the ALC Data, was specifically to prevent Kinesso (or anyone else, including Acxiom) from building any product that competed with the products offered for sale by Adstra.

30.     The MDSA also contains robust confidentiality provisions in Section 8, which restricts either party from disclosing confidential information, including information about the ALC Data, to any third party.

31.     Section 8.1 defines "Confidential Information" broadly, and includes a specific provision that "[i]n the case of ALC as the Disclosing Party, Confidential Information includes, without limitation, the ALC Data."  (Ex. 1, § 8.1.)

32.     Section 8.2 provides that the Receiving Party shall not disclose to any third party or use the Disclosing Party's Confidential Information except as expressly permitted in this Agreement or as otherwise necessary to perform its obligations or exercise its rights hereunder." (Ex. 1, § 8.2.)

33.     Section 8.5 is entitled "Injunctive Relief" and it provides that:

> Each party acknowledges that its breach of the requirements in this Section 8 may cause the other party immediate and irreparable damage for which recovery of money damages would be inadequate.  Accordingly, if the Receiving Party breaches or threatens to breach the obligations in this Section 8, the Disclosing Party shall have the right, in addition to other remedies available to it, to seek injunctive relief to enjoin such acts without the necessity of posting a bond.

34.     Section 9 is entitled "Retained Rights," and it provides that Kinesso (Client):

> Acknowledges that ALC has expended substantial time, effort, and funds to develop, create, compile, provide and deliver the ALC Data.  Client agrees that all ALC Data is owned by ALC (or its licensors or providers, as applicable).  Nothing contained in this Agreement shall be deemed to convey to Client, or to any other party, any ownership interest in or to the ALC Data or ALC Confidential Information.  Client shall not acquire any license to use the ALC Data, or any ALC Confidential Information in excess

of the scope and/or duration described in the Agreement or Schedule.  Client shall not **(a)** reverse engineer, disassemble, decompile, or attempt to derive the underlying source code or protocols for the ALC Data; **(b)** use the ALC Data to develop any product or service expressly prohibited within any Schedule; or **(c)** use the ALC Data for purposes of benchmarking or other comparative analysis without ALC's prior written consent.

35.     Section 10 is the termination provision which provided that the initial term of the MDSA was three (3) years and would "automatically renew for additional periods of one year each," unless one of the parties notified the other at least ninety (90) days prior to the expiration of the then-current term.

36.     Section 10.2 provided for immediate termination for material breach, upon notice of breach a failure to cure within thirty (30) days.

37.     Section 10.3 further provided that Adstra could suspend Kinesso's access to the ALC Data upon a breach of the Agreement or indication of a security vulnerability.

38.     Significantly, Section 16 of the MDSA, provides, in part, that Kinesso was not permitted to assign the MDSA to any other party absent written consent from Adstra:

> Neither party may assign this Agreement or delegate its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, each party shall have the right to assign this Agreement to a corporate affiliate or any successor to substantially all of the business or assets of such party's business unit to which this Agreement relates, whether by merger, consolidation, asset purchase or otherwise.  **<u>Any assignment or attempted assignment by either party without the other party's written consent shall be null and void</u>**.

(Ex. 1, ¶ 16 (emphasis added).)  This provision was drafted with the specific intent of preventing Acxiom from gaining access to the ALC Data, because Adstra was well aware that Acxiom had the ability and desire to use the ALC Data in a competitive manner. Specifically, it was known

that Acxiom was attempting to break into the market of selling this type of data to omnichannel marketers.

39.     Section 16 further provides that New York law applies to the MDSA and that:

> If any legal action is brought by a party to enforce this Agreement, **the prevailing party will be entitled to receive its reasonable attorneys' fees, court costs, and other out-of-pocket collection** expenses, in addition to any other relief it may receive.

(Ex. 1, ¶ 16 (emphasis added).)

**Adstra Enters Into Data Processor Agreement with Acxiom in October 2021**

40.     On or around October 6, 2021, Todd Thomas, a principal at Acxiom, emailed Andy Johnson and Kevin McKenna of Adstra stating that Acxiom "need[ed] to get a third party processor agreement in place for Acxiom to process Adstra data on behalf of Kinesso."

41.     On the same day, October 6, 2021, Mr. McKenna informed Mr. Thomas that, based on his conversation with Kinesso the previous week, "it sounded like the scope of the Acxiom project would be fairly narrow to only include processing the Adstra historical name and address matching repository to standardize the name and address fields to match the Acxiom file layouts.  This output would only be used by Kinesso in their ID graph to optimize terrestrial ID assignments."

42.     On or about October 8, 2021, Adstra agreed to enter into a separate, limited agreement that was intended to allow Acxiom, a "Data Processor," to gain partial access to the ALC Data for the limited purpose of allowing Acxiom to assist Kinesso in its use of the ALC Data (the "Data Processor Agreement").  (Ex. 2.)

43.     The Data Processor Agreement memorialized the parties' email exchange in providing that the scope of the project was for "the processing of Adstra historical name and address matching repository to standardize the name and address fields to match the Acxiom file

layouts.  This output will only be used by Kinesso in their ID graph to optimize terrestrial ID assignments."  (Ex. 2.)

44.     The Data Processor Agreement further provided that "Processor will not duplicate or compile any Data or provide the same in any form to any third party."  (Id.)

45.     Further, the Data Processor Agreement states that:

> Except as done at the request of Partner [Adstra] or Client
> [Kinesso], and for the exclusive benefit of Client, Processor shall
> not conduct any analyses of the Data or otherwise use it to
> understand the nature, character of quality of the Data, nor shall
> Processor [Acxiom] use any information it obtains as a result of its
> handling, processing or possession of the Data in connection with
> the creation, testing, promotion, marketing, selling and/or licensing
> of Processor's information, products or services.

46.     The Data Processor Agreement provided for a one-year term and renewed automatically for successive one-year terms unless terminated upon ninety (90) days written notice.

**Acxiom Requests That the MDSA Be Assigned to It in April 2022, But Adstra Refuses**

47.     In April 2022, Todd Thomas of Acxiom contacted Adstra to discuss the possibility of Acxiom assuming or "adopting" the Kinesso Master Data Supply Agreement.

48.     In that same time period, Acxiom provided drafts to Adstra of a revised Master Data Supply Agreement wherein it substituted its own name for that of Kinesso and also circulated a draft "Adopting Agreement," pursuant to which all three parties would have agreed that Acxiom could adopt the Master Data Supply Agreement.

49.     The draft Adopting Agreement contained signature lines for Acxiom, Kinesso and Adstra.

50.     As of April 2022, Acxiom was aware and fully acknowledged the fact that any assignment of the MDSA required written consent from Adstra.

51.     Adstra, however, was not interested in allowing for an assignment of the MDSA from Kinesso to Acxiom because Acxiom is, and was at the time, Adstra's competitor, and allowing Acxiom access to the ALC Data would have had severe negative consequences for Adstra.

52.     As such, the proposed revised MDSA and draft Adopting Agreement were never executed.

**Acxiom Requests Again to Assume the MDSA in Early 2023, But Adstra Continues to Refuse**

53.     In January and February 2023, Mr. Thomas of Acxiom reached out once again to Adstra to inquire about Acxiom "adopting" the MDSA from Kinesso.

54.     On February 9, 2023, Mr. Thomas emailed Kevin McKenna at Adstra, stating "[s]ince this is auto renewing, are we better off to finish off the adopting agreement to have this put under Acxiom control and then look at renewal later this summer?"

55.     For the reasons set forth above, namely that Adstra viewed Acxiom as a major competitor, Adstra did not want the MDSA to be "put under Acxiom's control," and thus, the requested assignment from Kinesso to Acxiom was never executed.

**Kinesso and Acxiom Purport to Enter Into an Assignment Agreement Without Adstra's Knowledge Or Consent and Acxiom Immediately Attempts to Terminate the MDSA.**

56.     On November 28, 2023, despite the fact that Adstra never consented to or signed an assignment agreement, Adstra received a letter from Mr. Thomas of Acxiom purporting to terminate the MDSA (i.e., the agreement between Adstra and Kinesso).

57.     Specifically, Mr. Thomas wrote that "this letter serves as Acxiom's formal ninety (90) days prior written notice of non-renewal of Schedule A," suggesting a termination date of February 29, 2024.

58.     This November 28, 2023 "termination" letter was troubling and puzzling to Adstra since, as described above, Adstra had never agreed to an assignment of the MDSA from Kinesso to Acxiom.

59.     In late February 2024, Acxiom provided to Adstra for the first time a copy of the so-called "Assignment Agreement."

60.     The Assignment Agreement appears to be Docu-signed by Acxiom and Kinesso as of November 27, 2023, just one day before the purported November 28, 2023 "termination" letter.

61.     In an email dated February 28, 2024, Jason Bier, the General Counsel and Chief Privacy Officer of Adstra, explained to Acxiom that any assignment of the MDSA was null and void because Adstra's consent had not been obtained.

62.     The Assignment Agreement was never provided as a draft to Adstra for review, nor does it contain a signature line for Adstra to sign, let alone Adstra's actual signature.

63.     Instead, Kinesso and Acxiom took it upon themselves to attempt to effect a transfer of the MDSA between them, despite knowing full well that Adstra's written consent was required, as evidenced by the plain language of the MDSA and by the prior attempts of Acxiom to obtain such consent from Adstra, unsuccessfully.

64.     It had become apparent to Acxiom and Kinesso that Adstra was not willing to consent to an assignment of the MDSA to Acxiom - one its largest competitors (which was not an unreasonable position for Adstra to take).

65.     The attempted assignment is, however, null and void and of no effect.

66.     The fact that Acxiom purported to terminate the MDSA the very next day after the purported assignment highlights the bad faith and scurrilous motivation behind their conduct.

67.     Acxiom apparently believed that if the MDSA was assigned to it, that it could help itself to the data it so desperately wanted - Adstra's ALC Data - and then avoid payment obligations to Adstra by providing notice of termination of the agreement the very next day.

68.     No doubt realizing that this strategy might backfire, on February 20, 2024, Mr. Thomas of Acxiom emailed Adstra representatives pretending that Acxiom had a right to the ALC Data by stating, "It's come to my attention that we are two payments behind to Adstra so I'm here to help fix that."

69.     In his February 20, 2024 email to Adstra, Mr. Thomas listed documents that he would "need" to "get the invoices into the system and paid as quickly as possible . . . ."

70.     Mr. Thomas continued the charade by requesting that "[a]ll future invoices be sent to [him] as Kinesso assigned your agreement to Acxiom and invoices should be coming to us for payment now, apologies if that didn't get communicated well."

71.     And in a further effort to try to trick Adstra into directing an invoice to Acxiom - apparently believing that would help Acxiom demonstrate that Adstra consented to the assignment (it did not) -  Mr. Thomas generously offered that Acxiom would "expedite [the invoices] and not subject them to our 45 day policy."

72.     Adstra did not comply with Mr. Thomas's baseless demands.

73.     Because the attempted "termination" was null and void, the MDSA has not been terminated.

74.     Schedule A of the MDSA, at Section 2.1, provides that the MDSA had an initial term of three years and would auto renew for subsequent one-year periods unless terminated by either party at least ninety (90) days before the expiration.

75.     The renewal date for the MDSA was on or about March 1, 2024; however, Kinesso did not provide notice of termination of the MDSA at any time.

76.     As such, the MDSA remains operative as between Adstra and Kinesso.

77.     Yet, Kinesso has failed to make the payments required by the MDSA and Schedules A and B thereto, and has indicated, in sum and substance, that it will not be making any additional payments to Adstra.

**Acxiom Is Using the ALC Data to Try to Gain an Unfair Competitive Advantage Over Adstra.**

78.     Acxiom has misappropriated the ALC Data and Adstra has reason to believe that Acxiom is using it in one of its existing product and/or to build a product that directly competes with Adstra in the omnichannel marketing space.

79.     Because the purported assignment of the MDSA to Acxiom is null and void, Acxiom has no right (contractual or otherwise) to use the ALC Data under the MDSA at all.

80.     In addition, the Data Processor Agreement that was previously entered into between Adstra, Kinesso and Acxiom, does not govern the ALC Data referenced in the MDSA and does not give Acxiom the right to use the ALC Data in the competitive and harmful manner in which it is using it now.

81.     Even if the attempted assignment were valid, which it is not, and even if Acxiom had properly stepped into the shoes of Kinesso as the contracting party, which it has not, Acxiom's use of the ALC Data greatly exceeds the scope of the license provided pursuant to the MDSA.

82.     Adstra stands to suffer significant and immediate harm to its entire business operations due to Defendants' calculated misconduct.

83.     Defendants must therefore be restrained from continuing their wrongful, anti-competitive and bad faith conduct.

## COUNT I

### *(Violation of the Defend Trade Secrets Act - All Defendants)*

84.     Adstra incorporates the foregoing paragraphs by reference, as if fully stated herein.

85.     Adstra's trade secrets, embedded, for example, in the ALC Data, are statutory trade secrets protected by the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1839.

86.     Adstra's trade secrets are sufficiently secret to derive economic value because they are not generally known to and are not readily ascertainable through proper means by other persons who can obtain economic value from their disclosure or use.

87.     At all times, Adstra has taken reasonable measures to protect the secrecy and confidentiality of its trade secrets.

88.     On information and belief, Defendants have misappropriated, and there is an imminent threat that Defendants will continue to misappropriate, Adstra's trade secrets by using without authorization all or portions of the proprietary ALC Data provided to Kinesso under the MDSA.

89.     Defendants knew that the ALC Data contain and/or constitute trade secrets, and Defendants had a duty to maintain the secrecy of those trade secrets and was not authorized to use them outside of the terms of the MDSA.

90.     Defendants also misappropriated Adstra's trade secrets by improper means by accessing the ALC Data without Adstra's express or implied consent, and even engaging in trickery to do so.

91.     Upon information and belief, Defendant Acxiom has used the ALC Data to enhance an existing product and/or build a product that competes directly with Adstra in the omnichannel marketing space.

92.     Upon information and belief, Defendant Acxiom has converted the Adstra trade secrets to its own economic benefit by using the trade secrets to sell products to its customers.

93.     Defendants' misappropriation of Adstra's trade secrets has been willful and malicious.

94.     The trade secret information misappropriated by Defendants is related to Adstra's sales of products and services that are used in, and intended for use in, interstate commerce.

95.     There is a genuine, imminent threat that Acxiom will continue to disclose or use Adstra's trade secrets in the course of its business.

96.     Defendants' use of Adstra's trade secrets will reduce or destroy the value of the trade secrets to Adstra because they enable Acxiom to offer the same or a similar product as Adstra offers.

97.     Adstra is entitled to damages for Defendants' misappropriation of Adstra's trade secrets, as well as injunctive relief to prevent the threatened or actual misappropriation of its trade secrets by Defendants pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3). Defendants' misappropriation has caused and will cause Adstra to suffer substantial and irreparable harm unless Defendants are enjoined from retaining and using Adstra's trade secrets.

## COUNT II

### *(Misappropriation of Trade Secrets, New York Common Law – All Defendants)*

98.     Adstra incorporates the foregoing paragraphs by reference, as if fully stated herein.

99.     Adstra's trade secrets, embedded, for example, in the ALC Data, are statutory trade secrets protected by New York law.

100.    Adstra's trade secrets are sufficiently secret to derive economic value because they are not generally known to and are not readily ascertainable through proper means by other persons who can obtain economic value from their disclosure or use.

101.    At all times, Adstra has taken reasonable measures to protect the secrecy and confidentiality of its trade secrets.

102.    On information and belief, Defendants have misappropriated, and there is an imminent threat that Defendants will continue to misappropriate, Adstra's trade secrets by using without authorization all or portions of the proprietary ALC Data provided to Kinesso under the MDSA.

103.    Defendants knew that the ALC Data contains and/or constitutes trade secrets, and Defendants had a duty to maintain the secrecy of those trade secrets and was not authorized to use them outside of the terms of the MDSA to which only Defendant Kinesso was a party.

104.    Defendants also misappropriated Adstra's trade secrets by improper means by providing access to and/or accessing the ALC Data without Adstra's express or implied consent.

105.    Upon information and belief, Defendant Acxiom has used the ALC Data to build a product that competes directly with Adstra.

106.    Upon information and belief, Defendant Acxiom has converted the Adstra trade secrets to its own economic benefit by using the trade secrets to sell products to its customers.

107.    Defendants' misappropriation of Adstra's trade secrets has been willful and malicious.

108.    The trade secret information misappropriated by Defendants is related to Adstra's sales of products and services that are used in, and intended for use in, interstate commerce.

109.    There is a genuine, imminent threat that Acxiom will continue to disclose or use Adstra's trade secrets in the course of its business.

110.    Defendants' use of Adstra's trade secrets will reduce or destroy the value of the trade secrets to Adstra because they enable Acxiom to offer the same or a similar product as Adstra offers.

111.    Adstra is entitled to damages for Defendants' past misappropriation of Adstra's trade secrets, as well as injunctive relief to prevent the threatened or actual misappropriation of its trade secrets by Defendants.  Defendants' misappropriation has caused and will cause Adstra to suffer substantial and irreparable harm unless Defendants are enjoined from retaining and using Adstra's trade secrets.

## COUNT III

### *(Unfair Competition-All Defendants)*

112.    Adstra incorporates the foregoing paragraphs by reference, as if fully stated herein.

113.    Defendants have engaged in conduct intended to undermine and misappropriate Adstra's business by using Adstra's confidential information, and to compete unfairly with Adstra in violation of Defendants' common law obligations.

114.    By virtue of its actions, as set forth above, Defendants have engaged in unfair competition and continue to unfairly compete against Adstra by knowingly and willfully misappropriating Adstra's confidential information.

115.     Defendants have also engaged in unfair competition by knowingly and willfully using Adstra's confidential information for its own benefit and to compete against Adstra.

116.     As a direct and proximate result of Defendants' actions, as detailed above, Adstra has suffered, and continues to suffer, immediate, irreparable, and unquantifiable damages, including but not limited to injury to its goodwill, reputation, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all for which Adstra has no adequate remedy at law.  Defendants' unlawful acts will continue to cause Adstra to suffer substantial and irreparable harm unless Defendants are enjoined from retaining and using Adstra's confidential information.

## COUNT IV

### *(Breach of Contract – MDSA - All Defendants)*

117.     Adstra incorporates the foregoing paragraphs by reference, as if fully stated herein.

118.     The MDSA constitutes a valid contract between Adstra and Kinesso.

119.     Adstra has performed all of its obligations under the MDSA.

120.     Kinesso has breached the MDSA by, among other things, purporting to assign the MDSA to Acxiom without consent of Adstra, which was required for any assignment to be valid.

121.     Kinesso has further breached the MDSA by using the ALC Data in a manner, and/or causing the ALC Data to be used in a manner, that exceeds the scope of the license provided to it in the MDSA and the Schedules thereto.

122.     Moreover, in impermissibly "assigning" the MDSA to Acxiom, Kinesso thereby breached the MDSA by disclosing the entirety of the ALC Data to Acxiom, a third party, in direct contravention of the MDSA's confidentiality provision.

123.     Kinesso is also in breach of the MDSA due to its failure to submit the contractual payments that it owes to Adstra under the MDSA and the Schedules thereto.

124.     In the event that the assignment to Acxiom were deemed valid (which it is not), Acxiom breached the MDSA by using the ALC Data in a manner that exceeds the scope of the license provided in the MDSA and the Schedules thereto.

125.     Defendants have breached the obligations under the MDSA and have proximately caused damages to Adstra in an amount to be determined.

## COUNT V

### *(Breach of Contract – Data Processor Agreement – Acxiom)*

126.     Adstra incorporates the foregoing paragraphs by reference, as if fully stated herein.

127.     The Data Processor Agreement constitutes a valid contract between Adstra and Acxiom.

128.     Adstra has performed all of its obligations under the Data Processor Agreement.

129.     Acxiom was provided with access to certain Adstra Data pursuant to the Data Processor Agreement for the limited purposes set forth therein to allow Acxiom to assist Kinesso with optimizing its use of the ALC Data.

130.     The Data Processor Agreement provides that Acxiom was not permitted to duplicate or compile any Data or provide the same in any form to any third party.

131.     In addition, Acxiom was generally not permitted (except in limited circumstances for the benefit of Kinesso) to "conduct any analyses of the Data or otherwise use it to understand the nature, character or quality of the Data, nor shall Processor use any information it obtains as a result of its handling, processing or possession of the Data in connection with the creation,

testing, promotion, marketing, selling and/or licensing of Processor's information, products or services."

132.    Acxiom has, however, upon information and belief, used the Data in a manner that is inconsistent with these terms, including incorporating the Data into own products and/or providing it or selling it to third parties.

133.    Acxiom has therefore breached its obligations under the Data Processor Agreement and caused injury to Adstra, in an amount to be determined.

## COUNT VI

### *(Tortious Interference with Contract – Acxiom)*

134.    Adstra incorporates the foregoing paragraphs by reference, as if fully stated herein.

135.    There existed a valid contract between Adstra and Kinesso, namely the MDSA.

136.    Acxiom was aware of the MDSA, as evidenced by its repeated attempts to assume or "adopt" it.

137.    Acxiom intentionally and improperly interfered with the MDSA by pressuring Kinesso to sign a purported assignment agreement pursuant to which Acxiom sought to become a party to the MDSA without the requisite consent of Adstra.

138.    The assignment or attempted assignment without Adstra's consent constitutes a breach of the MDSA by Kinesso.

139.    Furthermore, Acxiom intentionally and improperly interfered with the MDSA by purporting to terminate the MDSA one day after the purported assignment on November 28, 2023.

140.    The attempted assignment was done by Acxiom with the specific purpose of acquiring access to the ALC Data, while at the same time attempting to avoid paying for such data under the terms of the MDSA.

141.    In other words, Acxiom decided to help itself to Adstra's data, incorporate such data into its own products and/or to sell to third parties, and avoid any further payment obligations to Adstra.

142.    Through this conduct, Acxiom tortiously interfered with the MDSA and Adstra has been damaged as a result.

**COUNT VII**

*(Breach of the Covenant of Good Faith and Fair Dealing in MDSA – All Defendants)*

143.    Adstra incorporates the foregoing paragraphs by reference, as if fully stated herein.

144.    There existed a valid contract between Adstra and Kinesso, namely the MDSA.

145.    The MDSA contained an implied covenant of good faith and fair dealing, namely a promise by both parties to the MDSA that neither would do anything which would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

146.    The duty of good faith and fair dealing encompasses promises that a reasonable person in the position of the promisee would be justified in understanding were included.

147.    Because the MDSA contained an implied covenant of good faith and fair dealing, the parties thereto owed each other a duty to act in good faith and conduct fair dealing.

148.    A reasonable person in the position of Adstra would be justified in understanding that a promise not to destroy or substantially impair Adstra's business was also included in the MDSA.

149.    Kinesso (and only to the extent the assignment were to be deemed effective, which it is not, Acxiom) breached the duty owed to Adstra by taking actions that allowed Acxiom, a direct competitor of Adstra, access to the ALC Data in order to directly compete with Adstra.

150.    Acxiom's access to and use of the ALC Data will have the effect of destroying or substantially impairing Adstra's business unless Acxiom is stopped immediately.

151.    Therefore, the breach of the implied covenant of good faith and fair dealing has proximately caused damage to Adstra in an amount to be determined.


## COUNT VIII

### *(Breach of the Covenant of Good Faith and Fair Dealing in Data Processor Agreement – Acxiom)*

152.    There is a valid contract between Adstra and Acxiom, the Data Processor Agreement.

153.    The Data Processor Agreement contained an implied covenant of good faith and fair dealing, namely a promise by all parties to the Data Processor Agreement that none of them would do anything which would have the effect of destroying or injuring the right of the other parties to receive the fruits of the contract.

154.    The duty of good faith and fair dealing encompasses promises that a reasonable person in the position of each promisee would be justified in understanding were included in the Data Processor Agreement.

155.    Because the Data Processor Agreement contained an implied covenant of good faith and fair dealing, Acxiom owed Adstra a duty to act in good faith and conduct fair dealing.

156.    A reasonable person in the position of Adstra would be justified in understanding that a promise by Acxiom not to destroy or substantially impair Adstra's business was also included in the Data Processor Agreement.

157.    Acxiom breached their duty to Adstra by taking surreptitious actions to access the ALC Data and other Adstra data in order to build a product that competes with Adstra.

158.    Acxiom's access to and use of the ALC Data will have the effect of destroying or substantially impairing Adstra's business unless Acxiom is stopped immediately.

159.    Therefore, Acxiom's breach of the implied covenant of good faith and fair dealing has proximately caused damage to Adstra in an amount to be determined.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in its favor against Defendants on the foregoing causes of action and seeks a preliminary and permanent injunction:

a)   directing Defendants to immediately cease using and/or selling all ALC Data or any other Adstra data, including for the purpose of building any type of identity resolution product;

b)   directing Defendants to provide Adstra with access to all facilities where Acxiom is storing or using the ALC Data or any other Adstra data such that Adstra may ascertain all products in which and/or for which its data has been used;

c)   prohibiting Defendants from any selling, moving, disposing, transferring, destroying, and/or intentionally diminishing the value of, the ALC Data or any other Adstra data; and

d)   directing Defendants to arrange for the transfer of all remaining ALC Data and Adstra data to the custody of a neutral party that will maintain custody and control over it pending final resolution of this matter, agreement of the Parties, or further order of this Court;

e)   prohibiting Defendants from selling any products containing or constituting the ALC Data or any other Adstra data through all channels and in all markets, including without limitation, direct sales to consumers through the Internet or through auctions or other bulk sales; and

    f)   awarding consequential and compensatory damages, as well as statutory damages, in an amount to be determined at trial plus interest, attorneys' fees and costs, as well as and such other relief as the Court deems just and equitable.

### **DEMAND FOR JURY TRIAL**

    Adstra hereby demands a trial by jury on all issues so triable.

Dated:  April 8, 2024
        New York, New York

                              Respectfully submitted,

                              AGUILAR BENTLEY LLC

                              *Attorneys for Plaintiff*

                    By:    */s/ Anna Aguilar*

                              Anna Aguilar
                              Anne Burton-Walsh
                              AGUILAR BENTLEY LLC
                              5 Penn Plaza, 19th Floor
                              New York, NY 10001

                              (212) 835-1521
                              aaguilar@aguilarbentley.com
                              (AA-9894)
                              aburtonwalsh@aguilarbentley.com
                              (AB-6620)

## VERIFICATION AND CERTIFICATION

I, Jason Bier, being duly sworn deposes and says:

       I am the General Counsel and Chief Privacy Officer of the Plaintiff in this Action; that I have read the foregoing Verified Complaint and know the contents thereof; the same is true of my own knowledge, except as to any matter therein alleged upon information and belief, and to those matters I believe it to be true based upon documents, books, and records.

Dated:  April 4, 2024

                                                _____
                                                  Jason Bier