# EXHIBIT 1

# MASTER DATA SUPPLY AGREEMENT

This Master Data Supply Agreement (this "Agreement") is entered into and effective as of the last date of execution by the parties (the "Effective Date") by and between ALC, LLC, a New Jersey limited liability company with its principal place of business located at 750 College Road East, Princeton, New Jersey 08540 ("ALC"), and Kinesso, LLC, a Delaware limited liability company with its principal place of business at 100 W33rd Street, New York, NY 10001 ("Client" or "Kinesso")

**1.      Agreement.** This Agreement contains the terms and conditions applicable to the licensing of data and/or provision of data products by ALC to Kinesso (collectively, the "ALC Data"). Terms and conditions specific to the Data ordered by Client are set forth in individual schedules signed by Client and ALC (each, a "Schedule"). In the event of any conflicting or inconsistent terms, the following order of precedence applies: (a) the terms and conditions in a Schedule (solely with respect to the ALC Data offered pursuant to such Schedule), and (b) this Agreement. The use of the term "days" shall mean "calendar days" unless otherwise specified.

**2.      License and Delivery of ALC Data.**

     **2.1**      Except as expressly provided otherwise in the applicable Schedule, ALC grants to Client a nonexclusive, nontransferable, perpetual, irrevocable (except in the event of termination by ALC for Client's material default), world-wide, royalty-free (except for the fees established in the applicable Schedule) right and license to use the ALC Data subject to the terms of this Agreement and the Schedule. ALC shall deliver the ALC Data to Client in accordance with the Schedule.

     **2.2**      Upon request from Acxiom ALC shall complete an annual data-collection certification, a form of which will be provided to ALC by Client, on an annual basis during the Term of the Agreement.

**3.      Permitted Uses of ALC Data**.

     **3.1**      Subject to any restrictions or specific requirements established in the applicable Schedule, Client is permitted to use the ALC Data in the development of products ("Client Products") that may be sold or licensed to its customers. Client may store the ALC Data or Client Products at a location that has reasonable security measures in place and has logical or physical segregation from other organizations, including but not limited to within Client's cloud storage services. Client may use brokers, resellers or other distribution channels in the sale and delivery of the Client Products.

     **3.2**      Client's use of the ALC Data in the development and license of the Client Products shall be subject to compliance with (i) all laws, rules and regulations applicable to the type of ALC Data licensed to Client hereunder; and (ii) Client's own privacy and data compilation policies and practices.

**4.      Fees and Payment.**

     **4.1**      Client shall pay ALC the license fees agreed upon in writing and set forth in the applicable Schedule or other mutually executed pricing document. Unless otherwise provided in the applicable Schedule or such pricing document, ALC shall invoice Client in accordance with the timing established in the Schedule, and all invoices shall be payable within thirty (30) days from receipt of the invoice.

     **4.2**      Except for taxes on ALC's net income, all sales and use taxes levied in connection with Client's licensing of the ALC Data shall be the responsibility of Client; provided, however, that: (i) ALC shall be responsible for collecting such sales and use tax and remitting to the appropriate taxing authority; (ii) all such taxes, if applicable, must be line-itemed within the applicable invoice; and (iii) ALC shall remain responsible for and reimburse Client for any penalties or interest incurred arising from ALC's failure to properly collect or remit taxes to the applicable tax authorities. All past-due payments of undisputed amounts 60 days past due shall accrue interest at a rate of one percent (1%) per month, or the highest rate permissible by law, whichever is less, on such amounts from the due date until paid in full; provided, however, that ALC must first notify Kinesso in writing of the late payment and intent to impose the interest penalty, and

Kinesso shall have five (5) business from receipt of such notice to cure the late payment without incurring any late payment interest.

  **4.3**  Unless otherwise specified in the applicable Schedule, ALC is responsible for all costs and expenses incurred by ALC in providing the ALC Data to Client.

**5.**  **Data Safeguards.** The provision of the ALC Data may include the delivery, access, and/or use by Client and/or ALC (as applicable) of certain data that is owned or licensed by the other party. Each party has implemented and shall maintain reasonable and appropriate security measures, compliant with all Laws (as defined in Section 4 below), to protect the other party's data from unauthorized access, disclosure, use, modification, destruction and/or loss.

**6.**  **Compliance with Applicable Laws.** Each party agrees to comply with all local, state, national, and international laws, rules, and regulations, as applicable to such party's role and activities described in this Agreement, including, without limitation, as applicable, (i) the California Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 et seq. and its implementing regulations; and (ii) Federal Trade Commission ("FTC") rules. ((i) and (ii) collectively, "Laws"). In addition, each party shall adhere to the applicable published self-regulatory principles and guidelines of the Digital Advertising Alliance ("DAA"). Moreover, without limiting the foregoing, Client shall not use the ALC Data for credit granting, credit monitoring, account review, collection, insurance underwriting, employment or any other 'permissible purpose' as defined by the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq. ("FCRA")), Federal Trade Commission interpretations of the FCRA, and similar state statutes or in a manner contrary to the Equal Credit Opportunity Act (15 U.S.C. § 1691 et seq.), or in a biased manner with the effect of disadvantaging any historically marginalized group.

**7.**  **Data Subject Requests/Regulatory Inquiries.** Each party shall provide reasonable and timely assistance to the other party to enable the other party to (a) promptly respond to any request from a data subject to exercise any of its rights under applicable Laws (including its rights of access, deletion, opt-out, as applicable) and (b) promptly respond to any inquiry or other correspondence received by such party from a regulatory authority, in each case in connection with the ALC Data or the Client data (each, a "Data Inquiry"). To the extent permitted by applicable Laws, the receiving party shall promptly inform the other party of the Data Inquiry, providing details of the same, and promptly provide reasonable assistance to permit the other party to comply with its obligations under applicable Laws and to respond to the Data Inquiry.

**8.**  **Confidentiality.**

  **8.1**  **Confidential Information.** As used herein, "Confidential Information" of a party or its affiliates ("Disclosing Party") shall mean all information of, or concerning, such Disclosing Party which is confidential, proprietary and/or competitively sensitive (or which such party is required by a third party to keep confidential) and is disclosed to or obtained by the other party ("Receiving Party"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Confidential Information may include, but is not limited to, business and marketing plans, technology and technical information, product designs, and business processes. In the case of ALC as the Disclosing Party, Confidential Information includes, without limitation, the ALC Data. In the case of Client as the Disclosing Party, Confidential Information includes, without limitation, any Client data. Except for personally identifiable information which is required to be kept confidential under applicable Laws, Confidential Information shall not include any information that: (i) is or has become publicly available through no fault of the Receiving Party or its employees or agents; (ii) is received from a third party lawfully in possession of such information without breach of any obligation of confidentiality; (iii) is disclosed to a third party by the Disclosing Party without restriction on disclosure; (iv) was rightfully in the possession of the Receiving Party without restriction prior to its disclosure by the other party; or (v) was independently developed by employees or consultants of the Receiving Party without use of the Disclosing Party's Confidential Information.

DocuSign Envelope ID: 7ED7B655-E974-4BB5-9339-3AB5889F312C

  **8.2** **Confidentiality Obligations.** The Receiving Party shall not disclose to any third party or use the Disclosing Party's Confidential Information except as expressly permitted in this Agreement or as otherwise necessary to perform its obligations or exercise its rights hereunder. The Receiving Party shall protect the confidentiality of the Disclosing Party's Confidential Information in the same manner that it protects the confidentiality of its own Confidential Information of like kind (but in no event using less than reasonable care). The Receiving Party shall promptly notify the Disclosing Party if it becomes aware of any actual or reasonably suspected unauthorized use or disclosure of the Disclosing Party's Confidential Information.

  **8.3** **Required Disclosures.** If the Receiving Party is compelled by applicable law or regulation to disclose Confidential Information of Disclosing Party, it shall provide the Disclosing Party (to the extent legally permitted) with (i) reasonable prior written notice of such compelled disclosure, and (ii) reasonable assistance in contesting the disclosure or obtaining a protective order, at the Disclosing Party's option and cost. Any actual disclosure under this Section 8 shall be limited to the minimum amount of information necessary to comply with the disclosure demand.

  **8.4** **Effect of Termination.** Immediately upon termination of this Agreement, all rights and licenses granted herein shall immediately terminate, and each party shall promptly return to the other, or destroy, any Confidential Information or copies thereof in such party's possession, whether in tangible or electronic form. This provision shall not apply to ALC Data licensed to Client hereunder. All obligations with destruction of ALC Data upon termination shall be governed by Section 2.1 of this agreement and the applicable Schedule.

  **8.5** **Injunctive Relief.** Each party acknowledges that its breach of the requirements in this Section 8 may cause the other party immediate and irreparable damage for which recovery of money damages would be inadequate. Accordingly, if the Receiving Party breaches or threatens to breach the obligations in this Section 8, the Disclosing Party shall have the right, in addition to any other remedies available to it, to seek injunctive relief to enjoin such acts without the necessity of posting bond.

**9.** **Retained Rights**. Client acknowledges that ALC has expended substantial time, effort, and funds to develop, create, compile, provide and deliver the ALC Data. Client agrees that all ALC Data is owned by ALC (or its licensors or providers, as applicable). Nothing contained in this Agreement shall be deemed to convey to Client, or to any other party, any ownership interest in or to the ALC Data or ALC Confidential Information. Client shall not acquire any license to use the ALC Data, or any ALC Confidential Information in excess of the scope and/or duration described in the Agreement or Schedule. Client shall not **(a)** reverse engineer, disassemble, decompile, or attempt to derive the underlying source code or protocols for the ALC Data; **(b)** use the ALC Data to develop any product or service expressly prohibited within any Schedule; or **(c)** use the ALC Data for purposes of benchmarking or other comparative analysis without ALC's prior written consent.

**10.** **Term; Termination.**

  **10.1** The term of the Agreement shall begin upon the Effective Date and shall continue until terminated in accordance with this section. The term of each Schedule shall be as set forth therein.

  **10.2** Either party may immediately terminate this Agreement upon written notice if there are no Schedules in effect. If either party is in material breach of the Agreement or any individual Schedule, the other party may terminate the individual Schedule and/or the Agreement, as applicable, if such breach is not cured within thirty (30) days following written notice thereof. Termination of the Agreement or any Schedule shall not relieve Client of its obligation to pay for any ALC Data provided by ALC prior to the effective date of termination.

  **10.3** ALC shall have the right to temporarily suspend Client's access to the ALC Data upon written or e-mail notice if ALC becomes aware of a breach of Agreement by Client or security vulnerability that has or could result in the unauthorized use, access or disclosure of the ALC Data and no remediation

of the security vulnerability or misuse has been, or is being made, by Client. ALC shall provide Client with no less than five (5) business days' advance written notice of such pending suspension, but may initiate suspension contemporaneously with such notice if exigencies require such suspension to protect the ALC Data from ongoing unauthorized use, access or disclosure due to such security vulnerability or misuse. ALC shall: (a) provide Client with a description of the unauthorized use, access or disclosure; (b) cooperate with Client in identifying appropriate remediation; and (c) immediately lift such suspension once appropriate remediation efforts have been made to prevent continued unauthorized use, access or disclosure of the ALC Data. In the event of any such suspension, the parties shall work together in good faith to attempt to resolve the problem with the goal of restoring Client's access to the ALC Data at the earliest feasible date.

10.4    Laws applicable to the ALC Data are subject to change. As such, if a party reasonably determines that a change in Laws would make it illegal or commercially infeasible or impracticable to continue licensing certain ALC Data to Client, it may, without liability, suspend delivery or usage of the applicable ALC data upon written notice to the other Party. During such suspension, Client shall be relieved of any payment obligations and the parties shall use reasonable efforts to amend this Agreement to implement an alternative method of providing the ALC data in accordance with such Laws. If an alternative method cannot be reasonably implemented, ALC will provide a refund of pre-paid license fees, and a pro-rata refund of any license fees paid for ALC Data delivered.

**11.    Warranties; Disclaimers.**

**11.1    Mutual Warranties.** Each party represents and warrants to the other that it (i) has full authority to enter into this Agreement and has obtained all necessary rights and permissions to engage in the activities and grant the rights contemplated herein, (ii) will comply with all applicable Laws in connection with its business activities in connection with this Agreement; and (iii) it has all rights and permissions necessary to provide the ALC data (in the case of ALC) and any Client data (in the case of Client) to the other party for the uses permitted in this Agreement. Additional warranties applicable to particular ALC Data may be set forth in a Schedule.

**11.2    ALC Warranties**.

(a)    ALC warrants that ALC Data (i) has been collected after having provided a clear and obvious opportunity for Notice and Choice (as defined below) regarding its collection; (ii) is suppressed or flagged such that the data subject's "Choice" has been honored by ALC; (iii) was not "harvested" or otherwise secured without the data subject's knowledge and the provision of Notice and Choice; (iv) has not been screened against any credit criteria; (v) and the files and media on which it is provided will be free of any virus, malware, Trojan horse, worm, rootkit, time bomb, cancelbot, spyware, adware, botnet, back door or similar type of harmful programming routines and (vi) does not, unless expressly permitted in the Schedule, contain information about data subjects under the age of sixteen (16). For purposes of this Section, "Notice and Choice" shall mean that the data subject has, prior to the time the ALC Data is supplied to Client, received disclosure of the ALC's information practices, including the categories of third parties with whom the information will be shared, and had an opportunity to exercise choice regarding ALC's sharing of such data subject's information with third parties.

(b)    If information contained in the ALC Data is collected by ALC from an Aggregator, the warranties set forth above and any additional warranties set forth in a Schedule shall extend to the collection practices of the Aggregator as well. For purposes of this Section, "Aggregator" shall mean a third party collecting information about data subjects from multiple first- or third-party sources.

**11.3    Disclaimers.** EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT OR IN A SCHEDULE, NEITHER PARTY MAKES ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AS TO ITS SERVICES, TECHNOLOGY, OR DATA (WHICH ARE PROVIDED "AS IS"), INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, OR REVENUE POTENTIAL.

**12. Indemnification.**

  **12.1 Mutual Indemnity.** Each party agrees to indemnify, defend, and hold the other party, its affiliates, and its and their respective officers, directors, members, managers, employees, and representatives (collectively, the "Indemnified Parties") harmless from and against any and all out-of-pocket losses, damages, fines and expenses (including reasonable attorneys' fees) arising from any third-party claim, demand, or proceeding related to any actual or alleged: (a) breach of such party's obligations under Section 6 of this Agreement; or (b) intentional breach of such party's obligations under Section 8 of this Agreement.

  **12.2 ALC Infringement Indemnity.** ALC shall indemnify, defend, and hold Client and its respective Indemnified Parties harmless from and against any and all out-of-pocket losses, damages, fines and expenses (including reasonable attorneys' fees) arising from any third-party claim, demand or proceeding to the extent it alleges infringement of any valid U.S. patent, copyright, or other valid U.S. intellectual property right of such third party by the ALC Data as used in accordance with this Agreement (an "Infringement Claim"). In the event of an Infringement Claim, ALC shall, at its sole expense, either: (i) procure for Client the right to continue using the ALC Data under the terms of this Agreement; or (ii) replace or modify the ALC Data to be non-infringing without material decrease in scope, coverage, efficacy, or functionality. If the foregoing options are not reasonably practicable, as determined by Client, in its reasonable discretion, Client shall have the right to terminate the affected Schedule and ALC shall provide Client a pro-rated refund of the unused fees paid by Client for the infringing ALC Data. Notwithstanding the foregoing, ALC shall have no liability or obligation to Client or any of the Client Indemnified Parties with respect to any Infringement Claim to the extent caused by or based on: (xi) use of the ALC Data by Client or any of Client's Indemnified Parties in combination with other business processes, products, devices, software, data, services or components which were not authorized or furnished to Client by ALC; (xii) modification or alteration of the ALC Data by Client, any of Client's Indemnified Parties, or a third party not contemplated by the permitted uses or authorized by Client; or (xiii) use of the ALC Data in violation of this Agreement.

  **12.3 Indemnification Procedure.** An Indemnified Party shall promptly provide the indemnifying party with notice of any claim, demand or proceeding for which indemnity is claimed hereunder (except that failure to do so only excuses the indemnifying party's obligations to the extent that the indemnifying party is materially prejudiced thereby) and cooperate reasonably with the indemnifying party (at the indemnifying party's request and expense) in defending or settling such claim, demand, or proceeding, including, but not limited to, providing any information or materials reasonably necessary for the indemnifying party to perform the foregoing. The indemnifying party shall control the defense and settlement of such claim, demand or proceeding, but shall not admit any liability or wrongdoing, or impose any obligation on, an Indemnified Party without the Indemnified Party's prior written consent. An Indemnified Party may participate in the defense of a claim at its own expense using counsel of its choosing.

**13. Limitation of Liability.** EXCLUDING EACH PARTY'S INDEMNIFICATION OBLIGATIONS IN THIS AGREEMENT, DAMAGE'S RESULTING FROM A PARTY'S GROSS NEGLIGENCE OR AN INTENTIONAL BREACH OF A PARTY'S OBLIGATIONS IN SECTION 6 ABOVE, AND CLIENT'S PAYMENT OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR (A) ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR INDIRECT DAMAGES, OR ANY DAMAGES FOR LOST PROFITS OR BUSINESS, ARISING OUT OF THIS AGREEMENT, OR (B) ANY OTHER DAMAGES HEREUNDER EXCEEDING IN THE AGGREGATE, FOR ANY AND ALL CLAIMS, $2,000,000, EVEN IF SUCH PARTY KNOWS OF THE POSSIBILITY OF SUCH DAMAGES.

**14. NOTICES.** Except for communications made in the normal course of business, any notice required hereunder shall be made in writing and sent to the designated recipient provided below by certified United States mail, return receipt requested, or by a nationwide courier delivery service. Notice that is delivered via email is sufficient to meet the notice requirement, provided it is: (i) confirmed as received by the other party, or (ii) an

original copy follows it by mail, as set forth above, in a timely manner. A party may change the name or address of the designated recipient by giving written notice to the other party. Any notice or communication shall be deemed given upon receipt.

   **14.1** <u>Client</u>. If to Client, notices or other communications required hereunder shall be sent to the address first set forth above, to the attention of the undersigned for Client, with a copy to Kinesso, LLC Attn: Josh Leicht, General Counsel, P.O. Box 2000, 301 East Dave Ward Drive, Conway, Arkansas 72033-2000; and

   **14.2** <u>ALC</u>. If to ALC, notices or other communications required hereunder shall be sent to the address first set forth above, to the attention of the undersigned for ALC.

**15.** **Publicity**. All media releases, public announcements, and public disclosures by either party relating to this Agreement or the subject matter hereof, including marketing material, but not including announcements intended solely for internal distribution or disclosures required to meet legal or regulatory requirements, shall be coordinated with and approved by the other Party prior to release.

**16.** **Miscellaneous.** The Agreement, as supplemented or amended by any Schedules, sets forth the entire understanding of Client and ALC with respect to the subject matter hereof, and the terms of the Agreement shall be superior to, control, and supersede all terms in any prior letters of intent, agreements, covenants, arrangements, communications, representations, or warranties, whether oral or written, by any officer employee, or representative of either party relating thereto. If any provision of this Agreement shall be determined by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be modified or excised to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. The parties are independent contractors, and no partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties is created by this Agreement. There are no third-party beneficiaries to this Agreement. This Agreement (including any Schedule) may be executed in counterparts, each of which will be deemed an original and all of which together will constitute one and the same document. Facsimile, PDF, or other electronic images of signatures to this Agreement or any written amendments hereto shall be valid as originals. No amendment or waiver of any provision of this Agreement shall be effective unless in writing and signed by Client and ALC. The failure of either party to insist upon or enforce strict performance by the other party of any provision of this Agreement or to exercise any right under this Agreement will not be construed as a waiver or relinquishment to any extent of such party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same will be and remain in full force and effect. Neither party will be liable for any breach of the Agreement, other than any default in payment obligations, due to any delay or failure of performance resulting from any cause beyond such party's reasonable control, including but not limited to the weather, unavailability of utilities or communications services (including access to the Internet), civil disturbances, acts of terror, acts of civil or military authorities, or acts of God. Neither party may assign this Agreement or delegate its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, each party shall have the right to assign this Agreement to a corporate affiliate or any successor to substantially all of the business or assets of such party's business unit to which this Agreement relates, whether by merger, consolidation, asset purchase or otherwise. Any assignment or attempted assignment by either party without the other party's written consent shall be null and void. This Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns. This Agreement shall be deemed to have been made in and shall be construed pursuant to the laws of the State of New York without regard to the conflict of laws provisions thereof. If any legal action is brought by a party to enforce this Agreement, the prevailing party will be entitled to receive its reasonable attorneys' fees, court costs, and other out-of-pocket collection expenses, in addition to any other relief it may receive.

**17.** **Survival**. Any provision of the Agreement that would normally survive termination, including all provisions with respect to payment, intellectual property, confidentiality, limitation of liability, and indemnification, shall survive termination of the Agreement for any reason.

IN WITNESS WHEREOF, Client and ALC, by their duly authorized officers, sign and deliver the MSA as of the dates set forth below.

| **ALC, LLC** | **KINESSO, LLC** |
|---|---|
| Signature: _[signature]_ | Signature: _[signature]_ |
| Name: Jonathan Kelleher | Name: Tom Dawson |
| Title: Chief Financial Officer | Title: Global Chief Commercial Officer |
| Date: 3/3/2020 | Date: 3/3/2020 |

7

# SCHEDULE A

# OFFLINE AND ONLINE IDENTITY FILES

This SCHEDULE TO MASTER DATA SUPPLY AGREEMENT (this "Schedule") is entered into and effective as of March 1, 2020 (the "Schedule Effective Date") by and between ALC, LLC ("ALC"), and Kinesso, LLC ("Client"). This Schedule is issued under and subject to the terms and conditions of the Master Data Supply Agreement signed by the parties (the "Agreement"), which is hereby incorporated by reference. All capitalized terms used in this Schedule which are not defined herein have the meanings set forth in the Agreement.

ALC and Client agree as follows:

**1.** **ALC Data License.** Subject to the license grant in Section 2.1 of the Agreement, Client hereby accepts right and license to use the ALC Data identified in Attachment A solely in accordance with the terms and conditions of the Agreement (including this Schedule) and the permitted uses set forth on Attachment A. ALC or its designated representative shall make available the ALC Data to Client in a form and format and at the time(s) specified in Attachment A.

      1.1      Pursuant to Section 1(a) above, Client is permitted to use the ALC Data to develop an Identity Resolution Client Product for sale or license to Client's customers ("Third Party"), and not for the purposes of selling, reselling, sublicensing, or otherwise providing such ALC Data *directly* to Third Parties. Upon ALC's request, Client shall provide written certification of Client's compliance with the ALC Data usage restriction established in the Agreement and this Schedule if deemed necessary by ALC in order to comply with applicable Laws and this Agreement. Client agrees to comply with all major programmatic media platform policies (to include Google, Facebook, Amazon, Xandr or other similar entities) ("Platform Policy") that materially restricts the efficacy of Client's ability to use ALC Data or derivative Identity Resolution Products for advertising purposes.

      1.2      Client agrees to pay ALC the fees set forth in Attachment A for Client's license to the ALC Data.

**2.** **Schedule Term.**

      2.1      The initial term of this Schedule will be three years commencing on the Schedule Effective Date. Thereafter, this Schedule will automatically renew for additional periods of one year each, unless a party notifies the other party in writing of its intent not to renew this Schedule at least ninety (90) days before the expiration of the then current schedule term. The initial term and all applicable renewals shall be referred to herein as Schedule Term.

      2.2      Client shall have the right to terminate this Schedule without cause upon written notice to ALC; provided that such termination right must be exercised on or before June 30th, 2020. Notwithstanding Section 2.1 of the Agreement, if Client shall exercise its right to terminate pursuant to this Section 2.2, the License grant in Section 2.1 of the Agreement shall expire, client shall no longer have a perpetual license to the ALC Data and Client shall promptly destroy and otherwise restrict the use of the ALC Data and derivatives of the ALC Data. Upon request, Client shall provide written certification of its compliance with the destruction requirements in this Section.

IN WITNESS WHEREOF, Client and ALC, by their duly authorized officers, each sign and deliver this Schedule as of the dates set forth below.

| **ALC, LLC** | **KINESSO, LLC** |
|---|---|
| Signature: *[signature]* | Signature: *[signature]* |
| Name: Jonathan Kelleher | Name: Tom Dawson |
| Title: Chief Financial Officer | Title: Global Chief Commercial Officer |
| Date: 3/3/2020 | Date: 3/3/2020 |

**ATTACHMENT A**

| | |
|---|---|
| **Description of ALC Data:** | Linked2Me Identity Graph Products: (i) Terrestrial Identity Keyed Records; (ii) Identity Linkage Data; and (iii) Digital Identity Graph. See Exhibit 1 for full description. |
| **Initial Delivery Date:** | March 17th, 2020 |
| **Delivery Method:** | ALC Data Files shall be delivered in a flat batch file format as mutually agreed upon by both parties. The transfer protocol will be via secure cloud storage (e.g. S3). |
| **Update Frequency:** | Varies by ALC Data file (see Exhibit 1) |
| **Service Levels** | ALC shall adhere to the Service Levels established in Exhibit 2. |
| **Permitted Uses:** | Associate and combine ALC Data with other data and derived works licensed or owned by Client for the purpose of: <ul><li>Development of a Omni-channel Identity Resolution Client Product. "Identity Resolution" means the process of collecting and matching identifiers across touchpoints (e.g. address, phone, email) and devices (e.g. smartphone, tablet, iot devices, PCs) ) for the purpose of creating persistent, comprehensive, consistent omnichannel identity graph that can be used to create underlying individual or touchpoint identifiers. Such identifiers may be used for, among other things, the matching of data and any other user identifiers of an individual or a household from one data source to another data source, to maintain and manage identity of that individual across sources of data. The Identity Resolution Product developed by Client, including the proprietary identifiers, which may be derived from the ALC Data, but shall be Client's proprietary intellectual property, and ALC shall have no right to either these identifiers or the underlying product or identity graph that may include ALC Data.</li><li>Providing Analytics including profiling, segmentation, and modelling services to Third Parties</li><li>Delivery, facilitation and measurement of online and offline advertisements on behalf of Third Parties.</li></ul>Client shall have the right to share the ALC Data with its vendors, contractors, or partners for such party's use on behalf of Client for the purposes described above, including, without limitation, the right to share the ALC Data with third-party platforms for the purpose of matching platform or destination data with Client Products. Where practical, ALC Data shall be hashed when shared with third parties. Any ALC Data shared in the clear will be encrypted during transmission, and Client shall ensure that the ALC Data is returned or destroyed upon completion of the processing performed by such third parties.<br><br>Client is strictly prohibited from reselling ALC Data to a reseller. The ALC Data can only be used for the purposes described above. |
| **Fees:** | <ul><li>$1.45 million for first year of the Schedule Term, to be invoiced as follows: $250,000 upon receipt of the initial ALC Data files, with the remainder to be invoiced in eight monthly installments of $150,000 beginning July 1, 2020. If Client exercises its right to terminate this Schedule pursuant to Section 2.2 of the Schedule, the initial payment of $250,000 shall not be refundable.</li><li>$1.8 million for each additional year of the Term, to be invoiced in monthly installments of $150,000.</li></ul>Client shall deliver payment to ALC within thirty (30) days following receipt of ALC's invoice, after the end of each calendar month in which ALC Data are provided by ALC to Client. |

**Exhibit 1 to Attachment A**

| | |
|---|---|
| **Terrestrial Identity Keyed Records** | |
| **Description of ALC Data:** | For purposes of the Agreement, ALC Data includes the following Terrestrial Identity Keyed Records: |
| | data file containing individual and Household (HH) level personally identifiable information with multiple records per individual that are tied to a synthetic key. The key could be same for multiple records if it is the same individual with different addresses, aliases etc., as a raw record with synthetic keys assigned to each specific record. |
| | Approximately 520 MM Individual records |
| **Update Frequency:** | ALC Terrestrial Identity File shall be delivered monthly. |
| **Identity Linkage Data** | |
| **Description of ALC Data:** | For purposes of the Agreement, ALC Data includes the following Identity Linkage data: |
| | ALC Log Files where a hashed email address (for avoidance of doubt, these are MD5, SHA1 or SHA256 hashed email address formats, pseudonymous IDs) is joined to Non-PII Data. Whereas Non-PII shall be defined as, but is not limited to, network cache information, network connection information, network session information, browser-level user agent information, device IP address information, or other browser-level attributes normally captured by ALC's pixels. |
| | Approximately 220 MM Cookies to email hash (last 30 days active) |
| | Approximately 180 MM MAIDs to email hash (last 90 days active) |
| | Note – The scope of ALC Data outlined in this schedule does not include deploying Kinesso specific pixels on ALC's match partner network. |
| **Update Frequency:** | ALC Log Files shall be delivered daily. |
| **Digital Identity Graph** | |
| **Description of ALC Data:** | For purposes of the Agreement, ALC Data includes the following Digital identity Graph data: |
| | Cross device graph connecting digital identifiers to each other either deterministically or probabilistically. ID level data - linkage of cookie, MAIDs directly observed identity data deterministically linked together. Probabilistic connections of identity data using proprietary ALC technology will be included approximately: |
| | 108MM HHs |
| | 230MM Consumers |
| | 600MM Devices |
| | 320MM Mobile Device IDs |
| | 1.2B Cookies |
| **Update Frequency:** | ALC Digital Identity Graph Files shall be delivered weekly. |

**Exhibit 2 to Attachment A**

**1.** **Initial Delivery / Updates**: ALC shall deliver the initial files of the ALC Data by March 17, 2020 in the format agreed to by the parties and containing those data elements specified in Exhibit 1. ALC will provide updates to the ALC Data in accordance with the frequency schedule in Exhibit 1. The parties shall document the specific delivery schedule.

**2.** **Service Level Requirements**: ALC shall deliver the ALC Data in accordance with the following Service Level Requirements:

**2.1** Delivery Schedule: ALC shall deliver the ALC Data in accordance with the delivery frequency identified in Exhibit 1 and the schedule documented by the parties.

**2.2** Communication of Changes: ALC shall provide a minimum of sixty (60) days prior written notice before making changes to the ALC Data or point of contact. Any changes to the ALC Data layout or the delivery schedule must be approved by Client in advance.

**2.3** Data Correction. ALC shall use commercially reasonable efforts to promptly correct, at no charge to Client, any errors in the ALC Data that are made known to ALC by written notice from Client describing such errors in sufficient detail with any necessary backup information or documents; provided, however, that Client acknowledges that some corrections of errors in the ALC Data shall be dependent on the availability of same from the source of the applicable data.

**2.4** Response Times. ALC shall respond to Client within 24-hours with an acknowledgement of receipt of all data questions and a proposed timeline for resolution or answer to the question received.

**3.** **Failure to Meet Service Level Requirements**: If ALC fails to meet any of the Service Level Requirements, Client will notify ALC and ALC shall take all steps necessary to correct or cure the failure within 2 business days of Client's notice. If ALC is at fault for failure to meet any of the Service Level Requirements, Client may withhold payment of Fees until such time as the failure has been cured. Once the breach has been cured Client shall resume paying the Fees; provided, however, that Client shall (i) review the number of calendar days that ALC used to correct the failure ("Remediation Period"); and (ii) reduce the Fees payable to ALC by an amount equal to one percent (1%) of the monthly installment the Data Fee per day for each file deliverable missed ((i) Terrestrial Identity Keyed Records; (ii) Identity Linkage Data; and (iii) Digital Identity Graph)) multiplied by the number of days in the Remediation Period. If the Remediation Period is more than fifteen (15) calendar days ("Severe Failure"), the Data Fees for the month in which the failure occurred shall be waived by ALC and Client shall have the additional right to terminate this Agreement. Two or more Severe Failures shall be deemed a material breach of the Agreement that is not curable for purposes of Section 10.2 of the Agreement. Nothing here in shall limit Client's rights of termination under Section 10.2 of the Agreement.

**4.** **Burn-In Period**. Although Client shall be expected to adhere to the Service Levels throughout the term of the Schedule and report any service level failures, the penalties imposed in Section 3 of this Exhibit shall not apply to service levels failures that occur prior to July 1, 2020. Prior to July 1, 2020, the Client has the right to adjust the frequency of the Updates in Exhibit 1.




**SCHEDULE B**

**DSP MAPPING FILES**

This SCHEDULE B TO MASTER DATA SUPPLY AGREEMENT (this "Schedule") is entered into and effective as of July 1, 2020 (the "Schedule Effective Date") by and between Adstra, LLC ("Adstra"), and Kinesso, LLC ("Kinesso"). This Schedule is issued under and subject to the terms and conditions of the Master Data Supply Agreement signed by the parties (the "Agreement"), which is hereby incorporated by reference. All capitalized terms used in this Schedule which are not defined herein have the meanings set forth in the Agreement. Adstra and Kinesso agree as follows:

**1.     Schedule Term.** This Schedule shall be coterminous with Schedule A to the Agreement. Unless otherwise agreed by the parties in writing, upon expiration of Schedule A, this Schedule shall terminate.

**2.     Adstra Data License.** Subject to the license grant in Section 2.1 of the Agreement, Kinesso hereby accepts right and license to use the Adstra Data identified in this Schedule solely in accordance with the terms and conditions of the Agreement (including this Schedule) and the permitted uses set forth herein.

**3.     Description, Delivery and Updates of Adstra Data:**

    **3.1**    The Adstra Data provided hereunder are "DSP Mapping Files", which consist of both raw web logs and device graph records, some of which are mapped to the Adstra Terrestrial Identity Keyed Records.

    **3.2**    Adstra shall provide Kinesso with a comprehensive list of all available DMP Mapping Files. Kinesso may select any DSP Mapping File for licensing that Adstra has available and may choose the order in which the DSP Mapping Files are licensed.

    **3.3**    During the Term of the Schedule, Kinesso may, at any time and on thirty (30) days' notice (either in writing or via email), elect to remove or add an available licensed DSP Mapping File. This includes the right to not license a DSP Mapping File.

    **3.4**    Prior to making a final selection, upon request, Adstra shall provide: (a) a count of the available records within each DSP Mapping File; and (b) a statistically significant sample file of the full DSP Mapping File for use by Kinesso in testing and validating the Kinesso/DSP integration.

    **3.5**    All DSP Mapping Files will be delivered in a flat batch file format as mutually agreed upon by both parties. The transfer protocol will be via secure cloud storage (e.g. S3).

    **3.6**    Selected DSP Mapping Files shall be updated daily via log files or weekly via graph files.

**4.     Permitted Uses:** The Permitted uses of the Adstra Data provided hereunder shall be the same as the permitted uses of the Data provided pursuant to Schedule A to the Agreement, as specified in: (a) Schedule A, Section 1.1; and (b) "Permitted Uses" Section of Attachment A to Schedule A, both of which are hereby incorporated by Reference.

**5.     Adstra Data License Fees:**

    **5.1**    For each DSP Mapping File, Kinesso shall pay the fees set forth in the table below, to be invoiced monthly in arrears as incurred.

| Monthly Volume | License Fee |
| --- | --- |
| Up to three (3) DSP Mapping Files | $10,000 monthly fee per DSP Mapping File |
| Up to ten (10) DSP Mapping Files | $10,000 monthly fee per DSP Mapping File for the first three (3) |
|  | $5,000 monthly fee per DSP Mapping File for next seven (7) |
| More than ten (10) DSP Mapping Files | $10,000 monthly fee per DSP Mapping File for the first three (3) |
|  | $5,000 monthly fee per DSP Mapping File for next seven (7) |
|  | $2,000 monthly fee per DSP Mapping File each file over ten (10) |

    **5.2**    There shall be no charge for: (a) the delivery of the counts and sample file, as described in Section 3.4 above; or (b) electing to remove or add a DSP Mapping File. Monthly fee for the DSP Mapping File shall begin only after receipt of the full DSP Mapping File.

    **5.3**    Notwithstanding the pricing set forth above, Adstra shall deliver the DSP Mapping File for The Trade Desk (TTD) for use during the remainder of calendar year 2020 ("POC Period"). There shall be no charge for the TTD DSP Mapping File during the first three months of the POC Period.  Thereafter, the pricing established in

Section 5.1 shall apply. The TTD DSP will not count toward the monthly volume discount until Kinesso is paying Adstra.

      **5.4**    Kinesso shall deliver payment to Adstra within thirty (30) days following receipt of Adstra's invoice.

**6.**    **Service Level Requirements**: Adstra shall deliver the Adstra Data in accordance with the following Service Level Requirements:

      **6.1**    <u>Delivery Schedule</u>. Adstra shall deliver the Adstra Data in accordance with the delivery schedule and update frequency identified in Section 3.

      **6.2**    <u>Communication of Changes</u>. Adstra shall provide a minimum of sixty (60) days prior written notice before making changes to the Adstra Data or point of contact. Any changes to the Adstra Data layout or the delivery schedule must be approved by Kinesso in advance.

      **6.3**    <u>Data Correction</u>. Adstra shall use commercially reasonable efforts to promptly correct, at no charge to Kinesso, any errors in the Adstra Data that are made known to Adstra by written notice from Kinesso describing such errors in sufficient detail with any necessary backup information or documents; provided, however, that Kinesso acknowledges that some corrections of errors in the Adstra Data shall be dependent on the availability of same from the source of the applicable data.

      **6.4**    <u>Response Times</u>. Adstra shall respond to Kinesso within 24-hours with an acknowledgement of receipt of all data questions and a proposed timeline for resolution or answer to the question received.

      **6.5**    <u>Service Level Failures</u>. If Adstra fails to meet any of the Service Level Requirements, Kinesso will notify Adstra and Adstra shall take all steps necessary to correct or cure the failure within 2 business days of Kinesso's notice. If Adstra is at fault for failure to meet any of the Service Level Requirements, Kinesso may withhold payment of Fees until such time as the failure has been cured. Once the breach has been cured Kinesso shall resume paying the Fees; provided, however, that Kinesso shall (i) review the number of calendar days that Adstra used to correct the failure ("Remediation Period"); and (ii) reduce the Fees payable to Adstra by an amount equal to one percent (1%) of the monthly Data Fee concerning the specific DSP Mapping File per day for each file deliverable missed multiplied by the number of days in the Remediation Period. If the Remediation Period is more than fifteen (15) calendar days ("Severe Failure"), the Data Fees for the month in which the failure occurred shall be waived by Adstra and Kinesso shall have the additional right to terminate this Schedule. Two or more Severe Failures shall be deemed a material breach of the Agreement that is not curable for purposes of Section 10.2 of the Agreement. Nothing here in shall limit Kinesso's rights of termination under Section 10.2 of the Agreement.

**IN WITNESS WHEREOF**, Kinesso and Adstra, by their duly authorized officers, each sign and deliver this Schedule as of the dates set forth below.

| **ADSTRA, LLC** | **KINESSO, LLC** |
|---|---|
| Signature: *Jonathan Kelleher* | Signature: *Tom Dawson* |
| Name: Jonathan Kelleher | Name: Tom Dawson |
| Title: Chief Financial Officer | Title: Global Chief Commercial Officer |
| Date: June 29, 2020 | Date: June 29, 2020 |

Schedule B to the Master Data Supply Agreement, Page 2