# EXHIBIT 2

***UNCERTIFIED ROUGH DRAFT***
This unedited rough transcript draft is uncertified and may contain incorrect punctuation, misspelled proper names and/or terminology, an occasional reporter's note, and/or inaccurate/nonsensical word combinations.  There WILL BE discrepancies between this form and the final form.

Please keep in mind that the final certified transcript's page and line numbers WILL NOT match the rough draft due to the addition and/or editing of title pages, indices, appearances of counsel, paragraphing, formatting, and other changes.

Due to the need to correct entries prior to certification, parties agree to use this transcript draft only for the purpose of augmenting counsels' notes and may not be cited or used in any way or at any time to rebut or contradict the certified transcription of the proceedings, and should not be distributed in any form to anyone who has no connection to this case.

      THE REPORTER:  Mic test.  One, two.  Check, check, check.
      THE VIDEOGRAPHER:  Okay.  Please stand by.  Good morning everyone.  We are going on the record at 9:10 AM on November 21st, 2024.  Please note that this deposition is being conducted virtually quality of recording depends on the quality of camera and internet connection of participants.  What is seen from the witness and heard on screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.  This is Media Unit one of the video recorded deposition of Erik Laykin taken in the matter of Adstra LLC vs. Kinesso, LLC, et al., filed in the United States District Court Southern District Of New York, case number 124-CV-02639-LJL.  This deposition is being conducted remotely using virtual technology.  My name is Thea Popko, representing Veritext and I am the videographer.  The court reporter is Katie Porter from the firm.  Veritext.  I'm not related to any party in this action, nor am I financially interested in the outcome.  If there are any objections to proceeding, please state them at the time of your appearance.  The court reporter will now ask for appearances.  State her stipulations and swear in the witness.
      THE REPORTER: Good morning. My name is Katie Porter.  I'm a notary authorized to take acknowledgements and administer oath to New York.  Parties agree that I'll swear in the witness remotely.
      Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:
      – is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition

build a, a knowledge base of, of their provenance.
BY MR. FRIEDMAN:
    Q Did you try to reverse engineer the rule sets in this matter?
    A No.
    Q Did you see anything in the record that indicates Acxiom or Esso? Try to reverse engineer the rule sets.
    A I see that Acxiom conducted comparative analysis of the ARA data and among the various thing, among the various reasons for such a thing would be to understand the nuances of those rule sets and how that data was constructed. You know, I-I-I-I-I know that the comparative analysis was disallowed and, and, and for that reason that doing the comparative analysis gives up certain key elements of, of the data and, and how it was constructed and, and, and what its relationship is to other data sets. And that's what Aster wanted to avoid.
    Q What rules were subject to that comparative analysis?
    MS. AGUILAR: Object to form lack of foundation.
    THE WITNESS: I didn't conduct the comparative analysis and I don't have access to the data that they compared it against, so I, I can't answer that question.
BY MR. FRIEDMAN:
    Q Well, in looking at Vina Xavier's email regarding Adstra testing, what rules do you see Ms. Xavier uncovering in that test?
    MS. AGUILAR: Object to form.
    THE WITNESS: I, I don't, I don't know that Ms. Xavier is even commenting on rule sets in that email, if I recall correctly.
BY MR. FRIEDMAN:
    Q Are, are you seeing anything in Ms. Savior's analysis that is reverse engineering rule sets?
    MS. AGUILAR: Object to form. Are you looking, are you wanting him to refer to a particular document? Daniel,
BY MR. FRIEDMAN:
    Q You can, you can refer to the excerpt on page 62 of your report, but it's also exhibit three.
    A Did you say page 62 on my report? I don't think I have 62. Page 35 you mean? Yes,
    Q Yes. I I'm referring to paragraphs yes. If said page, I misspoke.
    A Okay, paragraph 62, her, her e email doesn't comment on rule sets.
    Q And looking at if you're in your report, this is page 37 within paragraph 63. And this is one of the attached spreadsheets to Ms. Savior's email, correct?
    A Yes.
    Q Anything in this about rule sets?
    A Well, this figure eight Esso and Acxiom data analysis of ster data isn't about rule sets. This is about the cumulative numbers of certain data.
    Q So sitting here today, are you aware of any documents in the record that reflect or reverse engineering of rule sets?

A Again, the comparative analysis can be used to draw out either inferences or direct correlations to rules that are built on the Aster side and can be learned by a third party such as Acxiom.
    Q So understanding that things can be used for certain purposes. Do you see anything in which there was a reverse engineering of rule sets? In the record,
    A The record's incomplete. This is why I would very much like to be able to review additional material on the Acxiom side to see exactly what they did with this data. We know that they did comparisons. We know that they held the data, that they managed the data, that they reviewed the data.
    THE REPORTER: Oh, can you repeat that louder please? Sorry, I keep hearing a voice in the background. I just wanna make sure we get everything on the record.
BY MR. FRIEDMAN:
    Q Were you able to hear Mr. Lincoln's answer? Yes,
    THE REPORTER: I heard his answer.
BY MR. FRIEDMAN:
    Q Okay.
    A Oh, there, there was, there was somebody else speaking on the Friedman side and I couldn't hear it either.
    MS. AGUILAR: Can we just read, have, have the question and answer right back?
    THE REPORTER: Yes. Standby.
BY MR. FRIEDMAN:
    Q Going to paragraph 78 of your report,
    A Imar in paragraph 78.
    Q Alright. And you're not offering any opinion as to whether Esso or Acxiom have actually breached a date of privacy statute, correct?
    A Correct.
    Q Would a breach by Esso or Acxiom also be a breach by abstract
    MS. AGUILAR: Object to form calls for a legal conclusion? Calls for speculation. Improper hypothetical,
    THE WITNESS: If I understand your correct, your question correctly, you're asking me if a breach of the data by Acxiom at the hands of Acxiom or Esso, would that be a breach by Adstra? Is that what you're asking me?
BY MR. FRIEDMAN:
    Q Yes.
    A O only to the ex. Well, my, my commentary in this section deals with the, the possibility of any obligations that ADRA may have to remove data that is that, that they're required to move under a statute or through litigation or elsewhere from their dataset. And if, if ARID does not have control or access to whom is using their data sets, then they, they would not have the ability to effectuate that removal. That was the, the purpose of this section. Data breach is really a, a different thing altogether. I suppose if, if, if Xi if data that was supplied by ARA to Esso and was subsequently transferred to Acxiom was subject to a data breach.

Q I'm sorry, but that wasn't my question.  Maybe.  Oh, I thought it was you some confusion.  If Esso or Acxiom breached a data privacy statute with the ATTRA data, would that also be a breach by Attra
    MS. AGUILAR:  Object to form calls for a legal conclusion. Calls for speculation.  Improper hypothetical.  I
    THE WITNESS:  Perhaps you could give a little meat on the bone to the hypothetical because I don't, I don't fully understand it.
BY MR. FRIEDMAN:
    Q Well, you talk about in the section of your report that a, that TRO may have the obligation to, under a data privacy statute to delete a piece of data, correct?  Yes.  If that data is in the hands of Acxiom and hypothetically, Acxiom does not delete that piece of data, is that a breach of a data privacy statute by aster?
    MS. AGUILAR:  Same, same objections?
    THE WITNESS:  I think it will depend on the privacy statute and how it's interpreted by either regulators or, or private lawyers.  You know, I, I, you know, I'm thinking for instance in the, from the perspective of GDPR and the European privacy statutes, you know, they're rather aggressive in enforcing those and so they may interpret that being that ADRA was the original provider of the data and that they would have some obligation to ensure that it is managed by their licensees according to the conditions of the GDPR.  But again, I'm, I'm not a lawyer, I'm also not a regulator, but I, I highlight it as, as a potential risk.
BY MR. FRIEDMAN:
    Q Well, can you name any date of the privacy statute in which that situation would be a breach by Adstra
    MS. AGUILAR:  Ob? Objection, calls for speculation.  A legal conclusion outside the scope of, of the subject matter of his report?
    THE WITNESS:  No, the reality is, is it doesn't take a, a, a regulation to create liability for ara.  I can think of a number of cases that I've been party to where the controller of data has provided their data set to a third party perhaps for processing or for analysis, and then that third party got breached and the party that ends up holding the bag is the originator of the data in, in one case that I'm thinking of right now, that we, that I testified in last year involved a hospital group where they pro they provided their data to a third party data processor for marketing purposes.  And that third data, that third party data processor sent it to another third data, third party, and that party got breached.  The data was stolen, but the hospital got sued in a class action lawsuit by thousands of patients and had to defend themselves.  So you don't need a statute or, or a regulatory schema here to create liability for the original source of data, which in, in this case could be ara there's a lot of liability as it relates to managing data these days.
BY MR. FRIEDMAN:
    Q Alright, but you can't think of a statute that would be violated if Acxiom misused some ARA data, correct.
    MS. AGUILAR: Objection call calls for a, a lot of things that, that, that are not the subject of the report calls for a legal

conclusion.
BY MR. FRIEDMAN:
    Q And I'm then gonna ask you not to make speaking objections.
    MS. AGUILAR: I'm gonna say, say my objection on the record and now I've done that and, and if you want him to answer, he can answer to the best of his ability.
BY MR. FRIEDMAN:
    Q Yes, please answer. And the question again was can you identify any statute that would be breached if Acxiom misused ASRA data?
    MS. AGUILAR: Okay, same objections?
    THE WITNESS: I would have to review the specific language in each one of the statutes that I've cited here in my report along with others. The, the, because there are other statutes that potentially could come into play here and, and as I sit here right now, I can't recall, recall the specific language of these statutes. I know that they are designed to protect consumers and to protect privacy and they can be interpreted all sorts of ways by regulators and litigants.
BY MR. FRIEDMAN:
    Q Okay. And you are, this section is titled Acxiom and ASRA is potential exposure to compliance issues, right?
    A The key word is potential.
    Q Okay. Is there any actual exposure to compliance issues?
    A Could be,
    Q But is there
    A That requires deeper analysis.
    Q You have not done that analysis, correct?
    A Not yet.
    Q The GDPR does not apply to the RA data, correct?
    MS. AGUILAR: Object to form calls for legal conclusion.
    THE WITNESS: It, it depends if there is, if there are EU citizens who are part and parcel of the, of the dataset,
BY MR. FRIEDMAN:
    Q Do you know if there are EU citizens that are part of the dataset?
    A I do not know.
    Q What's the difference between an optout and a right to deletion
    MS. AGUILAR: Object to form calls for legal conclusion?
    THE WITNESS: Well, from a practical perspective, an operational perspective, a optout is a term of art that re refers to your ability as a consumer to request to be removed from a database that is controlled by a third party. For instance, if I'm receiving emails from Target, sorry to target target a second time, but if I'm receiving emails from Target trying to sell me Christmas goods and I I don't wanna receive those emails, there will generally be a link at the bottom of the email that allows me to click on it and opt out of their marketing campaigns. The, the right did you say the right to be deleted?
BY MR. FRIEDMAN:

Q Yes. Or the right to be forgotten as it's sometimes called.
A Right. So the right to be deleted, the right to be forgotten is a construct that has been enshrined in the European landscape for consumer privacy. And it essentially says that as a consumer, you have the, the, the actual right to not only remove yourself from these lists, but to be forgotten. You can force the data brokers, the data holders, all the way to the, the largest of the data providers and, and man and, and systems such as Google to be removed from their indexes and from their databases so that your name and, and your identity is not swept up in, in those collections.
Q Alright. I'm looking at figure 13 on page 48 of your report. You call this Astro's privacy opt-out options. Do you see that?
A I see it, yes.
Q Astro doesn't have any right to deletion or right to be forgotten? Correct.
A I'll have to read it to, I'm doing a quick read on it. I, and, and maybe I need to absorb it a little deeper, but my read on it is that ADRA does in fact allow for an opt-out.
Q Yes. Does it allow for a right to be deleted or a right to be forgotten?
A I don't see anything to that effect in this particular carve out that I included in the document. I, that's not to say that it doesn't exist. They may have other language that I just didn't include or didn't see or, but this particular carve out here relates to the optout rights of consumers as it relates to ads or data.
Q You would agree with me that this optout that you chose to include in your report has no impact on the data that ASRA has already delivered under the MDSA? Correct?
     MS. AGUILAR: Object to form
     THE WITNESS: If I understand you correct. Well, you know, I don't, I don't fully understand the question.
BY MR. FRIEDMAN:
Q Does the attra opt out that you included in your report have any impact on data that Adstra has already delivered under the MDSA?
     MS. AGUILAR: Object to form.
     THE WITNESS: Well if, if Adstra is allowing their consumers who access the Adstra site the opportunity to opt out of the Adstra data collection and then Adstra sells or licenses that data to a third party, I would presume that the third party has the obligation to allow consumers to opt out of that data set, which I would expect would be a data set that includes ARA data and perhaps other data as in the case of Canso. But to the extent that ARA would have an obligation to cleanse or purge records from the data that they're, that they have licensed out retroactively, I don't think that obligation exists unless one of these agree, one of these regulations that I've cited call for it. And, but I do believe that ADRA would still have an obligation to cleanse data new, you know, the, the new, the new builds of the data, if you will, as, as they come in.
BY MR. FRIEDMAN:
Q Okay. But they don't deliver those new builds of the data to

Esso or any other client after the termination of the data supply agreement, is that correct?
          MS. AGUILAR:  Object to form.
          THE WITNESS:  I would expect not.  Yeah.
BY MR. FRIEDMAN:
     Q Okay.  Has at Scrub made any requests of Acxiom or Esso to delete specific data due to opt-outs that Esso or Acxiom is not complied with?
     A I don't know,
     Q By the way, as Attra requested that Acxiom and Esso delete the data, the, the, the entire ATTRA data and all builds of the graph that were built with Adstra data?
          MS. AGUILAR:  Object to form.
          THE WITNESS:  I dunno.
BY MR. FRIEDMAN:
     Q Okay.  You're familiar with a litigation hold, correct?
     A Yes.
     Q What is a litigation hold?
     A Litigation hold is a term of art that references there.  The requirement of a party to preserve data could be in the physical or electronic form, un unencumbered, un untouched and, and pristine and its purpose, particularly in the electronic world.  The world of email and electronic documents is to ensure that documents are not deleted or modified that could serve as evidence in litigation or arbitration.
     Q Is that a reason that the defendants would not have deleted prior versions of the graph in their possession?
          MS. AGUILAR:  Object to form calls for speculation.
          THE WITNESS:  It, it very well could be.
BY MR. FRIEDMAN:
     Q In fact, Adstra asked defendants not to delete prior versions of the graph as well as the Adstra data itself, correct?
          MS. AGUILAR:  Object to form.  Lack of foundation?
          THE WITNESS:  I don't recall, but it would, it would, I could see how that would happen.
BY MR. FRIEDMAN:
     Q The lawsuit was filed April 8th, 2024, correct?
     A I don't have the complaint in front of me, so I don't know the exact date.
     Q Does that sound roughly right?
     A Yes.
     Q Okay.  So after April 8th, and I'll represent to you that was the date the original complaint was filed, you would expect that defendants would not delete the Adstra data or graph builds that were built, you know, with the Adstra data?
          MS. AGUILAR:  Object to form.  Correct.
          THE WITNESS:  Best best practice would be to segregate any relevant data to the litigation and either hold in place with a marker of some sort that says litigation hold and or to place that data in the hands of a third party, maybe a, an e-discovery vendor or counsel for purposes of preservation.

BY MR. FRIEDMAN:
    Q And your understanding is that defendants did segregate the data, correct?
    MS. AGUILAR: Object to form.
    THE WITNESS: I don't have a, I don't have any visibility into how the defendants handled their electronic data with the, with one exception. And that is that I do know that they held Adstra data in their S3 environment
BY MR. FRIEDMAN:
    Q And holding the ADRA data in the S3 environment is a form of segregation, correct?
    MS. AGUILAR: Object to form.
    THE WITNESS: It could be depending on a variety of factors. Such as was access restricted or did access continue? I think as practice would, would dictate that you would segregate data in such a way that it could not be accessed or if it was accessed that it was in read-only mode so that it could not be impacted, modified or, or, or any of the metadata changing on it.
BY MR. FRIEDMAN:
    Q Okay. And you've seen nothing in the record that it has been accessed after April 8th, correct?
    MS. AGUILAR: Object to form.
    THE WITNESS: My understanding is that in fact, Acxiom did have access to the data after April of 2024. And in my report on page 45, paragraph 74, I, I discussed my finding that the data was, had Acxiom's engineering team had access at least as of May 1st, 2024 to this data
BY MR. FRIEDMAN:
    Q Understanding that Acxiom has access, you can't point to anything in the record in which Acxiom did access the data, correct?
    MS. AGUILAR: Object to form. Asked and answered.
    THE WITNESS: I've I've requested access to data that would answer that question. I haven't received it. I don't know.
//
BY MR. FRIEDMAN:
    Q Can you point to anything in the record that shows that Acxiom did access the data after April 8th, 2024?
    MS. AGUILAR: Asked and answered multiple times? Object to
    THE WITNESS: Form. From my perspective as a eDiscovery expert, the record is incomplete.
BY MR. FRIEDMAN:
    Q Understanding the record is incomplete. Can you point to anything in the record that shows Acxiom access the data?
    MS. AGUILAR: Same objections?
    THE WITNESS: No.
BY MR. FRIEDMAN:
    Q Going back to paragraph 72 of your report,
    A I'm on page 72,
    Q I'm sorry, paragraph 72
    A And my apologies, I'm on paragraph 72. Okay. There is a 72,

Q  So you reference an email dated February 23rd, 2024 where you say in Roman, I, my understanding of this communication is that it reflects Acxioms retention and processing of all the data previously provided by abstract to Esso and would be included in new graph builds.  Do you see that?
        A  Yes.
        Q  Alright.  So I'm going to show you exhibit I think seven.  Let me know when you see it.
(Exhibit 7 was marked for identification.)
        A  I now have Exhibit seven up on my screen.
        Q  Okay.  So on the second page of the exhibit, there's an email from James Mooney dated February 27th, 2024 at 12:31 PM Do you see that
        A  Page three email from James to
        Q  Page two of the exhibit,
        A  Excuse me, page two email from James Mooney Tuesday, February 27. 2024.  Yes, I see it.
        Q  Okay.  And he writes, once we ingest, we provide it to the graph team.  You see that?
        A  I see that.
        Q  And the graph team was at Esso, correct?  I
        A  Don't know.
        MS. AGUILAR:  Yeah, and I mean, take, take your time to read through the, the entire document.
BY MR. FRIEDMAN:
        Q  Sure.
        MS. AGUILAR:  If, if you need to.
        THE WITNESS:  I read it.
BY MR. FRIEDMAN:
        Q  Okay.  And this is the document you referenced in paragraph 72 of your report, correct?
        A  Yes.
        Q  So where is the graph team?
        A  Object to form.
           Unless I'm missing something.  I don't see where it indicates specifically where the graph team is, but this, all of this communication is internal within Acxiom.  I I, so I'm not really following the question.
        Q  Well, do you have an understanding of whether the graph team was within Acxiom or within Esso
        A  In relying on this email thread? Unless I'm missing something.  It it, it appears that this is all communication within Acxiom and they're discussing the, the ingestion of the Adstra data for the REAL ID graph.  I mean there's a mention here, the syndication files going to the other team.dot Do, I mean, I don't know what that means.  I I don't, I'll read it again.  It, the, the, the way that I interpret this email is that Acxiom is having a discussion concerning the ingestion of ARA data and that it will be managed on some level by the graph build team.  It doesn't say where the graph build team is.
        Q  Okay.  And this is a discussion of one file of ARA data,