UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                                                      :
ADSTRA, LLC,                                                          :
                                                                      :
                                        Plaintiff,                    :
                                                                      :
                 -v-                                                  :          24-cv-2639 (LJL)
                                                                      :
KINESSO, LLC and ACXIOM, LLC,                                         :          OPINION AND ORDER
                                                                      :
                                        Defendants.                   :
                                                                      :
----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_02/19/2025__

LEWIS J. LIMAN, United States District Judge:

Plaintiff Adstra, LLC ("Adstra" or "Plaintiff") moves for partial summary judgment

pursuant to Federal Rule of Civil Procedure 56.  Dkt. No. 101.  Defendants Kinesso, LLC

("Kinesso") and Acxiom, LLC ("Acxiom," and together with Kinesso, "Defendants") cross-

move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Dkt. No. 128.[1]

---

[1] Also pending before the Court are the following motions: 1) Defendants' motion to dismiss,
Dkt. No. 44; 2) Adstra's motion for reconsideration of the denial of a motion to compel
discovery, Dkt. No. 88; 3) Adstra's motion to preclude expert reports and testimony, Dkt. No.
114; 4) two motions by Defendants to preclude expert reports and testimony, Dkt. Nos. 117, 122;
and 5) Adstra's motion to compel Defendants to produce certain documents in unredacted form,
Dkt. No. 200.  Arguments made at the motion to dismiss stage have been incorporated into the
parties' summary judgment briefing.  *See* Dkt. No. 129 at 11–13; Dkt. No. 152 at 5–9.  The
Court need not decide the motions to preclude experts because even assuming that Defendants'
expert reports should be precluded and Plaintiff's expert reports should be admitted, Defendants
are entitled to summary judgment.  *See Kelly v. Beliv LLC*, 2024 WL 1076217, at *10 n.9
(S.D.N.Y. Mar. 12, 2024) ("The Court does not need to decide whether any portion of the
Matthews Declaration is admissible," because "[e]ven if Dr. Matthews' entire declaration was
admitted in its present form, it would not lend support to Plaintiff's claim.").  For purposes of this
opinion, the Court therefore considers the testimony of Plaintiff's experts and disregards the
testimony of Defendants' experts.  Adstra's motion for reconsideration, Dkt. No. 88, is denied.
Adstra's original motion to compel, Dkt. No. 66, sought "all documents and communications"
concerning several events, and specifically objected to Defendants producing only documents
"sufficient to reflect" those events, *id.* at 2–3, 13.  In seeking reconsideration, Adstra attempts to
evade the Court's prior holding by conceding that "sufficient to reflect" is the baseline and

For the following reasons, Defendants' motion for summary judgment is granted, and Plaintiff's motion for partial summary judgment is denied.

## BACKGROUND

The following facts are taken from Plaintiffs' Rule 56.1 statement of material facts, Dkt. No. 106, Defendants' Rule 56.1 statement of material facts, Dkt. No. 131, and supporting exhibits. The facts set forth below are undisputed unless otherwise indicated.

## I.    The Parties

Plaintiff Adstra (formerly known as ALC, LLC, or "ALC") has built an omnichannel identity resolution product ("OIRP"), Conexa, which identifies consumers, addresses, or households across multiple media by linking together separate datasets relating to individual customers. Dkt. No. 168 ¶¶ 1, 3, 15; Dkt. No. 102-3 at 21:23–25. For example, the product might correlate an email address submitted online with publicly available property information associated with the same email address. Dkt. No. 102-2 ¶ 26. This type of product enables clients to execute targeted marketing campaigns across different types of media. Dkt. No. 102-2 ¶ 13. Adstra invested millions of dollars and several years developing the Conexa platform. Dkt. No. 168 ¶ 107. Adstra sometimes provides or licenses data to other entities to help them build or enhance their own identity-resolution products. Dkt. No. 6-1 ¶ 11.

---

arguing that Defendants' production is not "sufficient to reflect" the relevant events. Dkt. No. 90 at 2–3. "A motion for reconsideration is [not] an occasion for . . . making new arguments that could have been previously advanced." *Allen v. United Student Aid Funds, Inc.*, 2021 WL 1978544, at *2 (S.D.N.Y. May 17, 2021) (quotation marks and citation omitted). Plaintiff is also unable to identify any "clear error or prevent manifest injustice" in the Court's original denial of the motion, as nothing in Plaintiff's motion for reconsideration affects the Court's alternative holding that Plaintiff's requests "are disproportionate to the needs of the case." Dkt. No. 81 at 5–6. Finally, Plaintiff's motion to compel Defendants to produce unredacted documents, Dkt. No. 200, concerns contracts and invoices that reflect Plaintiff's alleged damages, and are not relevant to the decision of this motion. That motion to compel is moot in light of the disposition of the motions for summary judgment.

Defendants Acxiom and Kinesso are subsidiaries of The Interpublic Group of Companies ("IPG"). Dkt. No. 150 ¶¶ 1–2. Acxiom is a global data brokerage and analytics company that specializes in marketing-related products and services. *Id.* ¶ 1. At the time of the events discussed here, Adstra regarded Acxiom as a competitor. Dkt. Nos. 102-18 at 9, 102-19 at 20.[2]

Kinesso is a developer of marketing tools including a referential graph that is used to link together disparate data corresponding to a particular individual, household, or address. Dkt. No. 150 ¶ 2. When Kinesso was launched in 2019, it was described as "a marketing intelligence engine powered by Acxiom." Dkt. No. 25 ¶ 7. It stated it would use "patent-pending proprietary technology, the best machine learning approaches, and the power of Acxiom data and that of other leading data providers." Dkt. No. 50 ¶ 4. Andrew Johnson, Adstra's chief data officer, states that at the time of the events here, Adstra regarded Kinesso as a non-competitor because it served a different client base. Dkt. No. 102-1 ¶¶ 17–18; Dkt No. 102-3 at 53:17–57:13.

## II.    The Master Data Supply Agreement

On March 3, 2020, Adstra entered into a Master Data Supply Agreement (the "MDSA") with Kinesso. Dkt. No. 150 ¶ 5. The MDSA contains general terms and conditions for the licensing of data (the "Adstra Data") by Adstra to Kinesso and is supplemented by two individual schedules. Dkt. No. 102-4 § 1. It states that in the event of any conflicting or inconsistent terms, the schedules control. *Id.*

The Agreement states that Kinesso, which is referred to in the agreement as "Client," will pay license fees set forth in the schedules in return for a license to use the Adstra Data. *Id.* §§ 2– 4. Specifically, the body of the MDSA states that:

> Except as expressly provided otherwise in the applicable Schedule, ALC[3] grants to Client a nonexclusive, nontransferable, perpetual, irrevocable (except in the

---

[2] Citations to both documents use ECF pagination.
[3] At the time of the MDSA, Adstra was known as ALC, LLC. *See* Dkt. No. 168 ¶ 1.

event of termination by ALC for Client's material default), world-wide, royalty-free (except for the fees established in the applicable Schedule) right and license to use the ALC Data subject to the terms of this Agreement and the Schedule.

*Id.* § 2.1.

It further allows that "[s]ubject to any restrictions or specific requirements established in the applicable Schedule, Client is permitted to use the ALC Data in the development of products ('Client Products') that may be sold or licensed to its customers." *Id.* § 3.1.

The MDSA gives each party the right to "immediately terminate this Agreement upon written notice if there are no Schedules in effect." *Id.* § 10.2.

Schedule A specifies that the data will be used solely in accordance with certain permitted uses set out in an attachment. Dkt. No. 102-4, Sch. A § 1. In particular, it states that "Client is permitted to use the ALC Data to develop an Identity Resolution Client Product for sale or license to Client's customers ("Third Party"), and not for the purposes of selling, reselling, sublicensing, or otherwise providing such ALC Data directly to Third Parties." *Id.* § 1.1. The attachment defines "Permitted Uses" as "[a]ssociate and combine ALC Data with other data and derived works licensed or owned by Client for the purpose of:"

- Development of a Omni-channel Identity Resolution Client Product. "Identity Resolution" means the process of collecting and matching identifiers across touchpoints (e.g. address, phone, email) and devices (e.g. smartphone, tablet, iot devices, PCs) for the purpose of creating persistent, comprehensive, consistent omnichannel identity graph that can be used to create underlying individual or touchpoint identifiers. Such identifiers may be used for, among other things, the matching of data and any other user identifiers of an individual or a household from one data source to another data source, to maintain and manage identity of that individual across sources of data. The Identity Resolution Product developed by Client, including the proprietary identifiers, which may be derived from the ALC Data, but shall be Client's proprietary intellectual property, and ALC shall have no right to either these identifiers or the underlying product or identity graph that may include ALC Data.

- Providing Analytics including profiling, segmentation, and modelling services to Third Parties.

- Delivery, facilitation and measurement of online and offline advertisements on behalf of Third Parties.

Client shall have the right to share the ALC Data with its vendors, contractors, or partners for such party's use on behalf of Client for the purposes described above, including, without limitation, the right to share the ALC Data with third-party platforms for the purpose of matching platform or destination data with Client Products. . . . Client shall ensure that the ALC Data is returned or destroyed upon completion of the processing performed by such third parties.

*Id.* at 10.[4]

The term "Third Party" is defined as "Client's customers." *Id.* Sched. A § 1.1.

Schedule A covers three types of data: "(i) Terrestrial Identity Keyed Records; (ii) Identity Linkage Data; and (iii) Digital Identity Graph." *Id.* Terrestrial Identity Keyed Records is a "data file containing individual and Household (HH) level personally identifiable information with multiple records per individual that are tied to a synthetic key," consisting of 520 million individual records, to be delivered monthly. *Id.* at 11; *see* Dkt. No. 102-2 ¶ 42. Identity Linkage Data consists of hashed email addresses joined to information such as cookies and mobile advertising IDs ("MAIDs"), delivered daily. *Id.* Adstra gets this information from partner companies that deploy what Adstra's expert refers to as a "pixel" on their technology platforms, which acts "as a beacon . . . collecting data from users who have opted to share their data." Dkt. No. 102-2 ¶ 46. The Digital Identity Graph is a "cross device graph connecting digital identifiers to each other deterministically or probabilistically," including hundreds of millions of households, consumers, device IDs, and cookies, delivered weekly. *Id.*

For this data, Kinesso agreed to pay $1.45 million for the first year and $1.8 million for each additional year thereafter. *Id.* The term of the schedule is three years, and it automatically renews for additional periods of one year "unless a party notifies the other party in writing of its

---

[4] ECF Pagination.

intent not to renew this Schedule at least ninety (90) days before the expiration of the then current schedule term." *Id.* Sched. A § 2.1.

Schedule B allows Kinesso to choose a number of Adstra's DSP Mapping Files for licensing, to be used for the same Permitted Uses set out in Schedule A and with the same term. *Id.* Sched. B.

The MDSA contains a confidentiality provision which restricts the disclosure of confidential information, specifically including the Adstra Data. *Id.* § 8.1. Upon termination of the agreement, all confidential information must immediately be returned or destroyed, but "[t]his provision shall not apply to [Adstra] Data licensed to Client hereunder." *Id.* § 8.4.

Section 9 of the MDSA, entitled "Retained Rights," recognizes that Adstra "has expended substantial time, effort, and funds to develop, create, compile, provide and deliver" the Adstra Data. *Id.* § 9. It states that "[n]othing contained in this Agreement shall be deemed to convey to Client, or to any other party, any ownership interest in or to the ALC Data," and that "Client shall not acquire any license to use the ALC Data . . . in excess of the scope and/or duration described in the Agreement or Schedule." *Id.* It further states:

> Client shall not (a) reverse engineer, disassemble, decompile, or attempt to derive the underlying source code or protocols for the ALC Data; (b) use the ALC Data to develop any product or service expressly prohibited within any Schedule; or (c) use the ALC Data for purposes of benchmarking or other comparative analysis without ALC's prior written consent.

*Id.*

The MDSA contains a limitation of liability provision that states:

> EXCLUDING EACH PARTY'S INDEMNIFICATION OBLIGATIONS IN THIS AGREEMENT, DAMAGE'S [sic] RESULTING FROM A PARTY'S GROSS NEGLIGENCE OR AN INTENTIONAL BREACH OF A PARTY'S OBLIGATIONS IN SECTION 6 ABOVE, AND CLIENT'S PAYMENT OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR (A) ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR INDIRECT DAMAGES, OR ANY DAMAGES FOR LOST

PROFITS OR BUSINESS, ARISING OUT OF THIS AGREEMENT, OR (B) ANY OTHER DAMAGES HEREUNDER EXCEEDING IN THE AGGREGATE, FOR ANY AND ALL CLAIMS, $2,000,000, EVEN IF SUCH PARTY KNOWS OF THE POSSIBILITY OF SUCH DAMAGES.

*Id.* § 13.

Finally, the MDSA contains certain language governing assignments. It states:

Neither party may assign this Agreement or delegate its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, each party shall have the right to assign this Agreement to a corporate affiliate or any successor to substantially all of the business or assets of such party's business unit to which this Agreement relates, whether by merger, consolidation, asset purchase or otherwise. Any assignment or attempted assignment by either party without the other party's written consent shall be null and void. This Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns.

*Id.* § 16. The assignment language was copied from Adstra's form agreement and was not edited by either party. Dkt. No. 150 ¶ 7; Dkt. No. 148-1 at 32:18–33:24.

## III.    Use of the Data

Kinesso used the Adstra Data as one of over twenty-five data sources to build its referential graph product, known as "KII," which links together disparate personal identifying information ("PII") to assign a unique identifier or KII ID. Dkt. No. 131 ¶ 21; Dkt. No. 134-1 at 24:12–21. Specifically, Kinesso used the Terrestrial Identity Keyed Records file it received from Adstra to build the referential graph. Dkt. No. 131 ¶ 9; Dkt. No. 102-9. Kinesso used two other types of Adstra Data, the Identity Linkage Data and the DSP Mapping files, to build crosswalks. Dkt. No. 131 ¶ 10; Dkt. No. 102-10; Dkt. No. 134-1 at 40:2–7, 64:3–24. A crosswalk matches one set of IDs with another set of IDs, linking two different pieces of information. Dkt. No. 102-17 at 68:14–15; Dkt. No. 103-12 at 48:11–15. For example, Kinesso used the Adstra Data to build a crosswalk from KII IDs to MAIDs. Dkt. No. 168 ¶ 115; Dkt. No. 102-10. The crosswalks were valuable and commercially useful to connect the graph to other information, but

they were separate from the build of the graph itself.  Dkt. No. 103-12 at 60:7–10, 172:18; Dkt. No. 134-1 at 64:3–24, 97:4–24.

Acxiom processed some of the Adstra Data on behalf of Kinesso.  Dkt. No. 102-20 at 4. On October 11, 2021, Acxiom and Adstra signed a Data Processor Agreement ("DPA").  Dkt. No. 102-11.  The DPA lists the "Data Processor" as Acxiom, the "Client" as Kinesso, and the "Partner" as Adstra.  *Id.*  It defines the term "Job References" by stating:  "The scope of the Acxiom project is for the processing of Adstra historical name and address matching repository to standardize the name and address fields to match the Acxiom file layouts.  This output will only be used by Kinesso in their ID graph to optimize terrestrial ID assignments."  *Id.*

The DPA applies to "any data that consists of personally identifiable information (PII) provided directly or indirectly to the Processor by the Client."  *Id.*  The Processor [Acxiom] agrees not to duplicate, compile, analyze, or attempt to understand the nature, character, or quality of the data.  *Id.* § 1.  It also states that the Partner [Adstra] shall not provide to the Processor [Acxiom] certain prohibited data, such as financial account numbers and government identification numbers.  *Id.* § 2.  It provides that after termination of the DPA, which requires ninety days written notice, Processor will destroy any data provided by Client.  *Id.* § 4.  The DPA limits the Processor's liability for any damages Partner incurs as a result of the misuse of data by the Client.  *Id.* § 7.

## IV.    Further Dealings Between the Parties

In February 2022, Acxiom Principal Partnership Senior Director Todd Thomas ("Thomas") emailed Adstra executives stating that, moving forward, Acxiom would "take the lead and be your primary point of contact" for data procurement "that will feed Acxiom and/or Kinesso solutions," allowing Kinesso "to hyper focus on building out products /solutions for our clients/marketplace."  Dkt. No. 134-8.  Thomas further stated that "[f]or the existing agreement

between Adstra & Kinesso, we have a call next week between our 3 teams to discuss what paperwork we will need to complete to move that agreement onto Acxiom paper." *Id.* An Adstra employee emailed a counterpart at Kinesso to "check in" and make sure Kinesso was "onboard with this approach," "[g]iven that Kinesso is our client, not Acxiom." Dkt. No. 134-9. The Kinesso employee clarified that this was part of a realignment to reduce duplicative efforts across the "two sister companies." *Id.*; *see* Dkt. No. 25 (describing a realignment across IPG companies). There is no evidence of a response to that communication.

In April 2022, Acxiom and Adstra discussed signing a new MDSA between Acxiom and Adstra and simultaneously signing an Adopting Agreement in which Kinesso would assign the Schedules of the Kinesso MDSA to Acxiom. Dkt. No. 103-1. The new proposed MDSA had similar terms to the Kinesso MDSA, but not identical terms. Dkt. No. 103-2. For example, it contained an additional warranty by Adstra. *Id.* § 11.2(c). The proposal also added the word "other," to the last sentence of the assignment language. *Id.* § 16. Rather than stating "[a]ny assignment or attempted assignment by either party without the other party's written consent shall be null and void," it stated "[a]ny other assignment or attempted assignment by either party without the other party's written consent shall be null and void." *Id.* Adstra's general counsel represented on May 10, 2022, that he was "[l]ooking forward to wrapping this up shortly," and Thomas responded that Acxiom would review and sign the Adopting Agreement. Dkt. No. 134-17. However, on June 28, 2022, Thomas emailed Adstra stating that Acxiom was still "waiting on some final testing to be completed and final decisioning internally." Dkt. No. 134-18. The proposed agreement was never finalized.[5]

---

[5] The parties dispute which side decided to stop pursuing the proposal. Dkt. No. 150 ¶ 19.

On August 9, 2022, Adstra and Acxiom entered into a Data Provider Evaluation Agreement ("DPEA").  Dkt. No. 39-3.  The DPEA provides that Acxiom and its Affiliates may use certain Data, "at no charge, for evaluation purposes to determine the acceptability of the Data and whether Acxiom has an interest in further licensing or purchasing."  *Id.* § 2.  The "Data" to be provided consists of certain log file data for the month of July 2022 that concerns "United States consumers and businesses, including demographics and other data."  *Id.*  Acxiom agrees to hold the Data in strict confidence, not to make copies of the Data except as necessary to perform the evaluation, and to destroy the Data and any copies at the end of the Evaluation Period, which is ninety days.  *Id.* § 5.  After evaluation, Acxiom did not proceed to license the relevant data. Dkt. No. 150 ¶ 15.

Also in or around 2022, Adstra and Acxiom discussed and completed other business transactions.  Dkt. No. 150 ¶ 20; Dkt. Nos. 134-19, 134-21.  Adstra's chief executive officer ("CEO") referred to Acxiom as a "frenemy" with which Adstra would do business at the right price.  Dkt. No. 134-22.

By July 2023, Acxiom and Kinesso began to consider terminating the MDSA.  Thomas emailed the product manager for KII/RealID, Veena Xavier, and others, asking for "a read from your team on the current contribution of Adstra to KII," given that "[o]ur agreement with Adstra . . . comes up for renewal in November 2023."  Dkt. No. 103-10.  Thomas asked:

1) What is unique contribution of Adstra?

2) For data that is not unique, can we identify who Adstra overlaps with the most?

3) If Adstra is terminated and no more updates are sent and existing data is retained, what impact would that have to KII?  . . .

4) If the desire is to renew Adstra, what value does it bring so that we can work towards creating a more fair value on the data for renegotiation purposes. . . .

*Id.* Xavier responded that "we have planned to investigate this in detail," and that at a high level, Adstra is a key contributor to certain crosswalks. Dkt. No. 173-6.

In September 2023, Xavier emailed Thomas additional analysis regarding the importance of the Adstra Data. Dkt. No. 103-11. She stated that "[i]n comparison with our largest sources to the graph, i.e. duncan006, there is a very small over-lap with Adstra." *Id.* She specifically noted that there was "low overlap of N+A occupancies" and "[n]o overlap of N+P occupancies" for "unique adstra to Duncan006." *Id.* She continued that "the impact to the match rate and flip rate is low, without Adstra data in the graph," "Adstra's removal will have a **LOW** impact to the graph build itself," and that "the biggest impact of losing Adstra is from the crosswalk build and maintenance perspective." *Id.* Xavier attached spreadsheets with columns for "Total graph occupancies," "Total Adstra," "Unique Adstra," "Total duncan006," "Unique duncan006," "Total Adstra/duncan006 Overlap," and "Unique Adstra/duncan006 Overlap." *Id.* at 11. She also attached other spreadsheets showing the impact of the loss of Adstra Data to the crosswalks and to the graph. *Id.* at 8–10, 13–16. Xavier testifies that "[o]ccupancies are . . . what makes the graph," and her analysis involved "comparing the source to the graph," not comparing "one data source to another data source." Dkt. No. 173-1 at 144:15–22. Plaintiff's expert testifies that he understands "occupancies," "to mean Households," and that he understands Xavier's email to show that she compared the Adstra Data to other sources of data. Dkt. No. 102-2 ¶ 62.

Further internal communications and subsequent analyses confirm that the Adstra Data was no longer useful to the build of the graph itself but was useful only in building crosswalks. Dkt. Nos. 104-7, 103-17, 103-18, 103-19, 134-26. By November 2023, Acxiom internally decided to terminate the MDSA on the basis that it was not worth the cost. Dkt. No. 150 ¶ 24. Executives internally discussed trying to renegotiate or otherwise acquire access to the data

sources useful for building the crosswalks, which were valued by project staff.  Dkt. Nos. 103-17; 103-18; *see* Dkt. No. 137-37 (describing plans to serve the termination, "conduct a working session with Adstra leadership to define the scope of the new partnership," and "do the new deal").

In October 2023, as internal discussions were ongoing regarding termination of the MDSA, Kinesso white-labeled[6] its KII identity resolution product to Acxiom, which rebranded it as "Real ID."  Dkt. No. 150 ¶ 25.  The product did not change; it was simply rebranded as Real ID rather than KII.  *Id.*; Dkt. No. 134-5 at 24:9–13.  Adstra continued to deliver the data to Kinesso, not Acxiom, and the same engineers continued to work on the project after the rebranding.  Dkt. No. 150 ¶ 49; Dkt. No. 134-16 at 118:14–17; Dkt. No. 102-16 at 79:1.  Contemporaneous internal communications also indicate that KII/RealID was still being run by Kinesso, and that Acxiom did not have the underlying data.  No. 104-15.  Although Kinesso's KII team eventually transitioned to Acxiom, Defendants and their employees are clear that this did not take place until May 1, 2024, and that prior to this date, Acxiom employees did not work on the reference graph.  *See* Dkt. No. 134-5 at 60:17–25, 67:5–20; Dkt. No. 102-16 at 47:23–48:3 ("Q: Do Acxiom employees work on the reference graph?  A: As of May 1st of this year of 2024, that engineering team is now Acxiom associates.  Prior to that, they were Kinesso and they are the only ones who have developed the reference graph."); Dkt. No. 170 ¶ 4 ("[T]he individuals at Kinesso (including Veena Xavier) directly responsible for the Kii graph . . . worked as employees of Kinesso at Kinesso'[s] offices until a transfer to Acxiom on May 1, 2024.").

---

[6] A "white label" is "a product or service made or developed by a company which is sold to the public under another company's name."  *White Label*, Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/white-label.

However, Plaintiff notes that a presentation by Acxiom dated November 2023 described two KII team members as "Acxiom resources" and eight as "Kinesso resources." Dkt. No. 104-8. It included an organizational chart showing "integration of Kinesso team into Acxiom organization," with most of the managerial roles filled by Acxiom employees and the roles below them filled by Kinesso employees. *Id.* In addition, the product manager for KII/RealID, Veena Xavier, sometimes used an Acxiom email address and made a presentation for Acxiom in October 2023 in which she is identified as "Director of Product: RealID Referential Graph." Dkt. No. 103-16; Dkt. No. 103-11.

## V.    Assignment of the MDSA

As the November 2023 deadline for renewal of the MDSA approached, Acxiom executives discussed whether Kinesso should assign the MDSA to Acxiom for Acxiom to terminate, or alternatively if Kinesso should terminate the MDSA and tell Adstra to talk to Acxiom to renegotiate. Dkt. No. 103-18. Assignment of the MDSA to Acxiom was seen as consistent with Acxiom's role as the primary IPG entity responsible for data procurement. Dkt. No. 134-1 at 42:3–8; Dkt. No. 134-27 at 118:19–23. In addition, Acxiom's vice president of data strategy, Bryan Donovan ("Donovan"), suggested that assignment would ensure that Acxiom has "ownership rights to the Identity data we have in Kii," "which is no purge." Dkt. No. 104-15. Although another employee questioned whether this was necessary given that KII was still run by Kinesso, Donovan responded "I don't like leaving any openings." *Id.*

On November 27, 2023, Acxiom and Kinesso executed an Assignment Agreement. Dkt. No. 103-5.[7] The Assignment Agreement stated that Kinesso assigned to Acxiom "all of

---

[7] The Agreement was signed on November 27, 2023, but stated it was effective November 13, 2023. *Id.*

Kinesso's rights, title and interests and duties, liabilities and obligations," under the MDSA. *Id.* § 1.

The assignment was described by Acxiom executives as an "administrative move" which did not "change anything on the project build side of things." Dkt. No. 134-16 at 37:2–13; *see* Dkt. No. 134-1 at 41:3–7. The same engineers who previously accessed the Adstra Data and worked on the project continued to do so. Dkt. No. 134-16 at 118:14–17; Dkt. No. 102-16 at 79:1. Adstra continued to deliver the data to Kinesso, except to the extent that certain files went to Acxiom under the DPA. Dkt. No. 150 ¶ 49. Acxiom's head of global identity stated that Acxiom had no access to the data files Adstra provided to Kinesso, even after the assignment, Dkt. No. 134-1 at 40:12–14, 41:3–7.

On November 28, 2023, Acxiom emailed Adstra a notice of non-renewal of the MDSA. Dkt. No. 103-7. The notice is signed by Acxiom and identifies Acxiom as "assignee of Kinesso." *Id.* The body of the email to which the notice is attached also identifies Acxiom as "assignee of Kinesso." *Id.*

On the same day, Adstra's chief financial officer forwarded Adstra's general counsel the Assignment Agreement and "told him that this was coming in, but also that there were some . . . discussions that we should expect coming up . . . in the next couple of months for the replacement of that agreement." Dkt. No. 150 ¶¶ 39–40; Dkt. No. 137-36 at 63:5–12 (confirming that counsel received a copy of the Assignment Agreement at that time). Adstra's CEO was also informed of the notice of non-renewal within a week of its receipt. Dkt. No. 134-

2 at 78:23–79:20.[8]  It "didn't occur to" him to raise any issues with the fact that Acxiom, not

Kinesso, had served the notice.  *Id.* at 85:16–17.

In December 2023, Acxiom and Adstra executives discussed "next steps" "following the

non-renewal notice."  Dkt. No. 150 ¶ 43.  These discussions involved putting together a "new

license proposal" which could also include the "deliverables part of the current license . . . that

will continue through Feb 24," with Adstra stating it was "not sure if you do or do not want to

consider receiving them going forward."  Dkt. No. 103-14.  Discussions between the parties

clearly distinguished between the "go forward license" and the "existing agreement."  *Id.*

According to Adstra's CEO, these discussions trailed off after a January 2024 meeting because it

"became very clear that what Acxiom was interested in pursuing to expand the relationship was

de minimis."  Dkt. No. 134-2 at 108:10–15.  There is no evidence that the parties ever signed any

new licensing agreement.

On February 20, 2024, Thomas emailed Adstra and stated that Acxiom was "two

payments behind" on the MDSA and he needed certain information to provide payment.  Dkt.

No. 104-13.  He stated "[a]ll future invoices to be sent to me as Kinesso assigned your agreement

to Acxiom and invoices should be coming to us for payment now, apologies if that didn't get

communicated well."  *Id.*  The next day, Adstra's general counsel wrote to Thomas stating that

---

[8] Eugene Becker, Acxiom's former general manager of data and identity, testified that he also
"reached out to Adstra to Rick [E]rwin [Adstra's CEO] to discuss the assignment and the
termination of the contract when both those decisions were made," and specifically discussed
"the fact that the contract was going to be managed by Acxiom, and that we were going to
terminate it with a view to renegotiating those portions of the agreement that remained of interest
to Acxiom."  Dkt. No. 134-27 at 121:24–122:20.  Becker further testified that Erwin was
generally receptive to the plan.  Dkt. No. 134-27 at 134:9–12.  Contemporaneous evidence
supports that Becker did call Erwin on November 28, 2023, and "broke the news."  Dkt. No.
137-37; *see* Dkt No. 131 ¶ 38.  Erwin denies that Becker explained the non-renewal on the call,
and states that he found out via his own employees.  Dkt. No. 134-2 at 78:23–79:20.

"the Kinesso contract with Adstra was never assigned to Acxiom."  Dkt. No. 103-6 at 4.  In

response, Acxiom's general counsel provided a copy of the Assignment Agreement.  *Id.* at 3.

Adstra's counsel replied that the assignment could not occur without written consent and should

be deemed null and void.  *Id.* at 2.

On February 23, 2024, Adstra stopped delivering data under the MDSA.  Dkt. No. 150

¶ 50.  On April 9, 2024, in response to the initiation of this litigation, Acxiom stopped using the

Adstra Data to build the Real ID graph.  Dkt. Nos. 137-53, 137-54.  The Adstra Data was not

purged from older versions of the graph, which remained available to Adstra.  *Id.*; *see* Dkt. No.

104-16; Dkt. No. 102-16 at 80:19–84:14.  By April 12, 2024, Acxiom removed the Adstra Data

from its crosswalks.  Dkt. Nos. 134-44, 134-45.  Internal emails stated that the version of the

graph released April 15, 2024, would not contain any Adstra Data, and that after that release

Adstra Data could "be deleted from Kinesso environments."  *Id.*; *see* Dkt. No. 150 ¶ 61.  Acxiom

kept a backup of the Adstra Data, Dkt. No. 104-18, and states that it sequestered the data in a

secure location, Dkt. No. 150 ¶ 62.

The parties dispute whether the Adstra Data provides a continuing benefit to the Real ID

graph.  *See* Dkt. No. 150 ¶¶ 54–55.  When data is used to train a machine learning model, the

model creates linkages and relationships based on the data.  Dkt. No. 104-3 at 48:20–49:18.

Therefore, if the data is later removed but the relationships are not unwound, the model will

continue to derive a benefit from the relationships it has learned.  *Id.* at 49:10–25.  However,

Acxiom asserts that its graph is "rebuilt each month from up-to-date source data."  Dkt. No. 134-

26.  Acxiom states that because of this restart, none of the relationships from the earlier builds

are retained, and the Adstra Data does not provide a benefit to versions of the graph currently in

use.  Dkt. No. 134-5 at 85:10–22.

**PROCEDURAL HISTORY**

Adstra filed the original complaint in this case on April 8, 2024.  Dkt. No. 1.  The next

day, Adstra filed a proposed order to show cause for a temporary restraining order and

preliminary injunction prohibiting Defendants from using or selling Adstra Data.  Dkt. No. 6.

The Court held a telephonic hearing on the proposed order to show cause on April 11, 2024.

Dkt. No. 30; *see* April 11, 2024 Minute Entry.  The Court then received briefing from the parties

on the proposed order to show cause, Dkt. Nos. 25–29, and heard oral argument on Adstra's

application for a temporary restraining order on May 1, 2024, Dkt. No. 35.  The Court held that

Adstra had not established sufficient basis for the issuance of a temporary restraining order.  Dkt.

No. 35 at 19:19–20:2.  The Court allowed expedited discovery consisting of "a 30(b)(6)

deposition and a limited request for documents into the question of how Acxiom is currently

using the Adstra data."  Dkt. No. 35 at 23.

On May 15, 2024, Defendants filed a motion to dismiss.  Dkt. Nos. 32–33.  On May 29,

2024, Adstra filed an amended complaint, Dkt. No. 39, and the motion to dismiss was denied as

moot, Dkt. No. 40.  Also on May 29, 2024, a Case Management Plan and Scheduling Order was

adopted providing that initial requests for production of documents would be served by June 13,

2024, that all fact discovery would be completed by September 20, 2024, and that expert

discovery would be completed by October 7, 2024.  Dkt. No. 37.

On June 20, 2024, Defendants filed a motion to dismiss the amended complaint.  Dkt.

Nos. 44–45.  Adstra filed a memorandum of law in opposition, Dkt. No. 50, and Defendants filed

a reply, Dkt. No. 52.

On September 6, 2024, Adstra sought an extension of discovery deadlines by

approximately eight weeks, in part due to the "current proposed deposition schedule," which

contemplated depositions being taken before documents were produced, being "contrary to the

17

normal course of discovery." Dkt. No. 53. Defendants opposed. Dkt. No. 54. The Court denied

the motion without prejudice to a later application for the reopening of any noticed depositions

based upon newly-produced documents. Dkt. No. 57. On September 20, 2024, the Court

granted an extension of time to complete expert discovery to November 15, 2024. Dkt. No. 60.

On October 11, 2024, Adstra moved to compel responses to certain discovery requests

which had been served on June 24, 2024, and September 11, 2024. Dkt. Nos. 61–62, 65–66.

After further briefing, Dkt. Nos. 72–75, 79, the Court denied the motion to compel as untimely,

and in the alternative as disproportionate to the needs of the case, Dkt. No. 81.[9]

On November 26, 2024, Adstra moved for reconsideration of the Court's decision to

deny its motion to compel. Dkt. Nos. 88–93. Defendants opposed, Dkt. Nos. 94–95, and

Plaintiff replied, Dkt. No. 98.

On December 16, 2024, Adstra filed a motion for partial summary judgment, Dkt. No.

101. The motion was supported by three declarations of counsel with a total of 58 exhibits, Dkt.

Nos. 102–104, a declaration of Adstra's Chief Data Officer, Dkt. No. 101, a memorandum of

law, Dkt. No. 105, and a Local Rule 56.1 statement. Dkt. No. 106. On the same day, Adstra

filed a motion to preclude reports and testimony from Defendants' experts Ron Schnell

("Schnell") and Bala Dharan ("Dharan"), supported by a memorandum of law and a declaration

of counsel with twenty-six exhibits. Dkt. Nos. 114, 116, 127.

---

[9] On November 11, 2024, Defendants moved to exclude the testimony of Adstra's expert witness
due to untimely disclosures, or in the alternative to extend summary judgment and *Daubert*
deadlines and for other discovery relief. Dkt. No. 78. Plaintiff largely agreed to the extension
and alternative relief. Dkt. No. 80. The Court denied the motion to strike Plaintiff's expert
report, extended the deadline to complete expert discovery to November 29, 2024, and set the
deadline for summary judgment and *Daubert* motions as December 16, 2024. Dkt. No. 82.

Defendants also filed a motion for summary judgment on December 16, 2024. Dkt. No. 128. Defendants' motion was supported by a memorandum of law, Dkt. No. 129, a Local Rule 56.1 statement, Dkt. No. 131, and a declaration of counsel with sixty-four exhibits, Dkt. No. 137. Defendants also filed motions to exclude the opinions and testimony of Plaintiffs' experts Erik Laykin ("Laykin") and Christopher W. Young ("Young"). Dkt. Nos. 117, 122. Each motion was supported by a memorandum of law. Dkt. Nos. 118, 124. The motion to exclude Laykin's testimony was supported by a declaration of counsel with seven exhibits, Dkt. No. 120, and the motion to exclude Young's testimony was supported by a declaration of counsel with eight exhibits, Dkt. No. 125.

On January 15, 2025, Adstra filed memoranda of law in opposition to Defendants' motion for summary judgment and in opposition to Defendants' motions to exclude the testimony of Laykin and Young. Dkt. Nos. 151–53. In opposition to Defendants' motion for summary judgment, Adstra additionally filed a declaration with eight exhibits and a counterstatement to Defendants' Rule 56.1 statement. Dkt. Nos. 148, 150. In opposition to the motion to exclude Laykin's testimony, Adstra filed a declaration of counsel with three exhibits, a declaration of Laykin with three exhibits, and a declaration of Adstra's general counsel. Dkt. Nos. 146, 147, 149. In opposition to the motion to exclude Young's testimony, Adstra filed a declaration of counsel with nine exhibits and a declaration of Young with one exhibit. Dkt. Nos. 140–41.

On the same day, Defendants filed memoranda of law in opposition to Adstra's motion for partial summary judgment and in opposition to Adstra's motion to exclude the expert reports and testimony of Schnell and Dharan. Dkt. Nos. 162, 166, 174–75. In opposition to Defendants' motion for summary judgment, Adstra also filed a counterstatement to Defendants' Local Rule

56.1 statement, Dkt. No. 168, a declaration of Acxiom's corporate representative, Dkt. Nos. 170–71, and a declaration of counsel with seven exhibits, Dkt. Nos. 172–73.  In opposition to the motion to exclude Schnell and Dharan's testimony, Adstra filed a declaration of counsel with eight exhibits, Dkt. Nos. 164–65, 177–78.

On January 29, 2025, Adstra filed a reply memorandum of law in support of its motion for partial summary judgment, along with an declaration of counsel with one exhibit. Dkt. Nos. 185–88.  It also filed a reply memorandum of law in support of its motion to preclude expert testimony, accompanied by a declaration with one exhibit.  Dkt. Nos. 181–84.  Defendants filed a reply memorandum of law in support of its motion for summary judgment, supported by a declaration of counsel with three exhibits and an additional declaration of Acxiom's corporate representative.  Dkt. Nos. 190–94.  Defendants also filed reply memoranda of law in support of its motions to exclude the opinions and testimony of Laykin and Young.  Dkt. Nos. 195–98.

On February 6, 2025, Adstra filed a motion to compel Defendants to produce certain previously-produced contracts and invoices in unredacted form.  Dkt. Nos. 200–01. Defendants opposed the motion.  Dkt. No. 202.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  In determining whether there are any genuine issues of material fact, the Court must

view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521

F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine

issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)

(citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Rather, to survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary

judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its]

pleading, or on conclusory statements, or on mere assertions that affidavits supporting the

motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal

citation omitted).  "Mere conjecture or surmise by the nonmovant in support of his or her case is

inadequate."  *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006).

Local Rule 56.1 of the Local Rules for the Southern District prescribes the manner and

method in which a party is to present undisputed issues of fact to the Court.  The moving party

must annex to its notice of motion "a separate, short and concise statement, in numbered

paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). The party opposing the motion for summary judgment is required to "include a correspondingly numbered paragraph admitting or denying, or otherwise responding to, each numbered paragraph in the statement of the moving party." Local Rule 56.1(b). The statements "must be followed by citation to evidence which would be admissible and set forth as required by Fed. R. Civ. P. 56(c)." Local Rule 56.1(d). The consequences of failure to follow these rules can be severe. "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Rule 56.1(c).

Thus, a Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz*, 258 F.3d at 74. If portions of a Rule 56.1 counterstatement cite to no admissible evidence in support of its denials, the Court is instructed to disregard those portions and deem the factual statements in the original Rule 56.1 statements admitted. *See, e.g.*, *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (holding that denials that are not supported by citations to admissible record evidence are to be disregarded). When the non-moving party in certain instances fails to cite to any record evidence for its denials, the Court accepts the moving party's characterization of those facts in its 56.1 statement as undisputed. *See Colton v. N.Y. Div. of State Pol.*, 2017 WL 5508911, at *2 (N.D.N.Y. Feb. 8, 2017) ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."); *Knight v. N.Y.C. Hous. Auth.*, 2007 WL

313435, at *1 (S.D.N.Y. Feb. 2, 2007) ("Pursuant to Local Civil Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record.").

**DISCUSSION**

Adstra's amended complaint brings ten causes of action: 1) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832, 1839; 2) common-law misappropriation of trade secrets; 3) unfair competition; 4) breach of the MDSA; 5) breach of the DPA; 6) breach of the DPEA; 7) tortious interference with contract; 8) breach of the covenant of good faith and fair dealing in the MDSA against both Defendants; 9) breach of the covenant of good faith and fair dealing in the MDSA specifically against Kinesso; and 10) breach of the covenant of good faith and fair dealing in the DPA.  Dkt. No. 39.  Adstra seeks summary judgment on the causes of action for misappropriation of trade secrets, breach of contract, and tortious interference with contract.  Dkt. No. 100.  Defendants seek summary judgment on all causes of action.  Dkt. No. 128.  Defendants' primary argument is that Acxiom could not have unlawfully used the Adstra data, because Kinesso properly assigned the MDSA to Acxiom.  Dkt. No. 129 at 11–26.[10] Adstra argues that the assignment was invalid, and that even if the assignment was valid, Acxiom improperly accessed the data prior to the assignment.  Dkt. No. 105; Dkt. No. 185 at 3–4.  The Court begins with the critical issue of the validity of the assignment.

**I.      Validity of the Assignment**

Whether Kinesso's assignment of the MDSA to Acxiom was valid turns on the interpretation of the anti-assignment clause in the MDSA.  Under New York law, "[t]he

---

[10] Defendants additionally argue that Acxiom never used the Adstra Data in any case, because it was used by Kinesso until April 2024 and then was removed from the graph in response to the onset of this litigation.  Dkt. No. 129 at 18–19.  Because the Court holds that the assignment was valid, it need not consider this argument.

fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent' and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'" *Donohue v. Cuomo*, 184 N.E.3d 860, 866 (N.Y. 2022) (quoting *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002)). Thus, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *CITGO Asphalt Ref. Co. v. Frescati Shipping Co., Ltd.*, 589 U.S. 348, 355 (2020) (internal citations and quotations omitted); *see also Electra v. 59 Murray Enterprises, Inc.* 987 F.3d 233, 244–245 (2d Cir. 2021); 1 Williston on Contracts § 30:6 (4th ed. 2024). Where possible, the court must give "'effect and meaning . . . to every term of [a] contract' and strive 'to harmonize all of its terms.'" *Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (quoting *India.Com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005)); *see Hercules OEM Grp. v. Zim Integrated Shipping Servs. Ltd.*, 2023 WL 6317950, at *10 (S.D.N.Y. Sept. 28, 2023) ("[A]n interpretation that gives reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable." (internal citations omitted)). The court must also avoid an interpretation that "sets up . . . two clauses in conflict with one another." *CITGO Asphalt Ref. Co.*, 589 U.S. at 362 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc*, 514 U.S. 52, 64 (1995)); *see Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017) ("[A] contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'" (citation omitted)).

New York law "strongly disfavors anti-assignment clauses." *Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, 598 F. Supp. 3d 158, 178 (S.D.N.Y. 2022). This is because a contract right is a form of property and "clauses that require consent for assignment give one

party to a contract significant control over whether the other party may dispose of any rights under the contract and therefore implicate concerns regarding alienation of property." *Brettler v. Allianz Life Ins. Co. of N. Am.*, 226 N.E.3d 885, 888–89 (N.Y. 2023).  Accordingly, New York courts distinguish between a covenant not to assign and an agreement that an assignment is void.  Although parties may covenant with one another not to assign a contract, the assignment is effective to convey rights to a third party unless the parties use "clear language" and "the plainest words" to provide that an assignment is void.  *Id.* at 887.  To be effective in preventing the transfer of the contract right, an anti-assignment clause may not simply "generally prohibit[] assignment," but must "specif[y] that an assignment 'would be invalid or void.'"  *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 226 (S.D.N.Y. 2014) (quoting *Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 505 (S.D.N.Y.2012)).  If the clause contains such "clear, definite, and appropriate language declaring the invalidity" of the assignment, courts will hold that an assignment in violation of the clause is void and the assignee obtains no interest in the contract.  *Sullivan v. Int'l Fid. Ins. Co*., 465 N.Y.S.2d 235, 237 (2d Dep't 1983); *see Brettler*, 226 N.E.3d at 887–88.  However, if the clause merely contains a promise not to make an assignment, without including specific language that an assignment is invalid, an assignment in breach of the clause remains valid.  *Brettler*, 226 N.E.3d at 887.  "[T]he clause is read instead as a personal covenant not to assign that 'justifies only an award of damages' against the assignor for breach."  *Id.* (quoting *Citibank, N.A. v. Tele/Res., Inc*., 724 F.2d 266, 268 (2d Cir. 1983)).

This distinction is critical.  "[A]n assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such

performance."  Restatement (Second) of Contracts § 317(a).  If the assignment is valid, then the assignee obtains rights and "can enforce the transferred rights" against the obligor.  29 Williston on Contracts § 74:22 (4th ed.); *see Citibank, N.A.*, 724 F.2d at 269 ("An assignment . . . is a separate agreement between the assignor and assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged. . . . Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor.").  A contract may prohibit the parties from making an assignment, but unless it also provides that an assignment is void, the assignee still obtains rights against the obligor.  The obligor is limited to suing its original counterparty for breach of contract and to recovering any damages incurred via the assignment.  *See Brettler*, 226 N.E.3d at 887; *Music Royalty Consulting*, 598 F.Supp.3d at 178–79 ("If Reservoir truly did not consent to the Assignment, its remedy was to sue the wrongful assignor . . . for breach of the Publishing Agreement, not to withhold payment of royalties from [the assignee].").  By contrast, a void assignment, like any other void contract, has "no legal force or binding effect."  *Szerdahelyi v. Harris*, 490 N.E.2d 517, 521 (N.Y. 1986); *Void Contract*, Black's Law Dictionary (12th ed. 2024) ("A contract that is of no legal effect, so that there is really no contract in existence at all.").  It is not effective in conveying rights against the obligor.

> The anti-assignment clause in the MDSA states:
>
> Neither party may assign this Agreement or delegate its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, each party shall have the right to assign this Agreement to a corporate affiliate or any successor to substantially all of the business or assets of such party's business unit to which this Agreement relates, whether by merger, consolidation, asset purchase or otherwise. Any assignment or attempted assignment by either party without the other party's written consent shall be null and void.  This Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns.

Dkt. No. 102-4 § 16.

This provision unambiguously allows each party to assign the MDSA to a successor or affiliate without the consent of the other party.  It permitted Kinesso to assign the MDSA to Acxiom without obtaining consent.  The first sentence sets up a general rule that neither party may assign the contract without written consent.  However, the second sentence creates a specific exception that "notwithstanding the foregoing, each party shall have the right to assign this Agreement to a corporate affiliate or any successor."  *Id.*  The use of the word "notwithstanding" is telling.  The Second Circuit "has recognized many times that under New York law, clauses similar to the phrase '[n]otwithstanding any other provision' trump conflicting contract terms."  *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010).  Thus, under the second sentence, each party has the unfettered right—without need for any further consent of the other party—to assign its rights to an affiliate or successor.  It is not a breach for the contracting party to enter an assignment agreement with an affiliate or a successor.

The third sentence does not take away what the second sentence gives.  It cannot be read to eliminate the right of successor or affiliate assignment which is conferred on each party by the second sentence.  Rather, the third sentence addresses what the first two sentences do not—the rights that the assignee will obtain in the event of an assignment made in breach of the agreement.  It states that "[a]ny assignment or attempted assignment by either party without the other party's written consent shall be null and void."  *Id.* § 16.  This clear language fulfills the requirement of "the plainest words" to render an assignment void, which the first two sentences did not.  *Brettler*, 226 N.E.3d at 887.  The first two sentences state that only certain assignments are permitted, but do not address whether the assignee will obtain rights against the contract obligor if a prohibited assignment occurs.  Under New York Law, this merely creates "a personal covenant not to assign."  *Brettler*, 226 N.E.3d at 887.  In the absence of the third sentence, if

Kinesso assigned the agreement to a third party, Adstra would be able to sue Kinesso for money damages, but the third party would inherit contract rights against Adstra with respect to the Adstra Data.  The "clear, definite and appropriate" language of the third sentence prevents this outcome by declaring that prohibited assignments shall be "null and void."  *Sullivan*, 465 N.Y.S.2d at 237.

Adstra argues that the plain language of the third sentence mandates that "any assignment," including assignment to an affiliate or successor, is void without consent.  Dkt. No. 152 at 4–5.  But this reading violates basic rules of contract interpretation.  Under New York law, court must give "'effect and meaning . . . to every term of [a] contract' and strive 'to harmonize all of its terms.'"  *Spinelli*, 903 F.3d at 200 (quoting *India.Com*, 412 F.3d at 323).  If Adstra's interpretation were accepted, the second sentence of the assignment clause would do no work.  New York courts presume that when parties include language in an agreement, they do so for a reason and have a purpose.  *See God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 845 N.E.2d 1265, 1267 (N.Y. 2006) ("A contract 'should be read to give effect to all its provisions.'" (quoting *Mastrobuono*, 514 U.S. at 63); *Wilson v. Poughkeepsie City Sch. Dist.*, 48 N.Y.S.3d 244, 246 (2d Dep't 2017) ("[A] court should not read a contract so as to render any term, phrase, or provision meaningless or superfluous." (citation omitted)). The second sentence thus must be read to mean that either party may assign its rights to a successor or affiliate, without obtaining consent.  And because Adstra's reading of the word "any" in the third sentence to cover even successor or affiliate assignments would "set[] up . . . two clauses in conflict with one another" and read the clause concerning affiliates and successors out of the contract, *CITGO Asphalt Ref. Co.*, 589 U.S. at 362, the third sentence must be read to refer to assignments that are made in violation of the agreement.  Put otherwise, the first sentence

requires consent of an assignment to a third party, the second sentence sets forth the advance

consent of each party to an assignment by the other to a successor or an affiliate, and the third

sentence makes clear that an assignment without consent—either the consent set forth in the

MDSA itself or consent subsequently provided—will render the assignment void.  This

interpretation is consistent with the basic principle of contract interpretation that a specific

provision overrides a general provision.  *See Carolina First Bank v. Banque Paribas*, 2000 WL

1597845, at *5 (S.D.N.Y. Oct. 26, 2000) ("It is a basic rule of contract interpretation that if a

specific and a general provision of a contract conflict, the specific provision governs.").

Adstra argues that Defendants' interpretation "reads out the first and third sentences of

the assignment clause" and renders the word 'any' in the third sentence superfluous.  Dkt. No.

152 at 4–5.  But, in fact, Defendants' interpretation "give[s] full meaning and effect" to each

sentence and word of the clause.  *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007)

(quoting *Excess Ins. Co. v. Factory Mut. Ins*., 822 N.E.2d 768, 771 (N.Y. 2004)).  The first

sentence sets out a general rule that assignment requires consent.  The second sentence creates an

exception and provides advance consent.  The third sentence explains the consequences for

making a prohibited assignment.  The word "any" ensures that "any" prohibited assignment is

void, rather than only some prohibited assignments.  The word "any" is not superfluous simply

because it only applies to any assignment to which Adstra has not already given consent.  *See*

*Small v. United States*, 544 U.S. 385, 388 (2005) (noting that the scope of the word "any" may

be limited by context, and collecting examples); *Flora v. United States,* 362 U.S. 145, 149

(1960) (noting that the word "any" is "a catchall" but does not "define what it catches").

Further, permitting free affiliate and successor assignment is consistent with the contract

as a whole and is the only interpretation that makes commercial sense.  *See Cambridge Cap. LLC*

*v. Ruby Has LLC*, 675 F. Supp. 3d 363, 390 (S.D.N.Y. 2023) ("[It is a] well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." (quoting *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012))). The object of the MDSA was to permit Kinesso to use the Adstra data "to develop an Identity Resolution Client Product for sale or license to Client's customers ('Third Party'), and not for the purposes of selling, reselling, sublicensing, or otherwise providing such ALC Data directly to Third Parties." Dkt. No. 102-4 § 1.1. It thus distinguished between "Data" which could not be provided "directly" to Third Parties, and the product generated from that "Data," which both parties intended and hoped would be sold to Third Parties. Third Parties were defined as Kinesso's clients. Tellingly, the MDSA has no non-compete clause. The MDSA does not prevent Kinesso from competing with Adstra and expressly provides that the product created by Kinesso using the Adstra Data shall be Kinesso's "proprietary intellectual property." Dkt. No. 102-4 at 10 ("The Identity Resolution Product developed by Client, including the proprietary identifiers, which may be derived from the ALC Data, but shall be Client's proprietary intellectual property . . ."); *id.* (providing that Adstra "shall have no right to . . . the underlying product or identity graph that may include [Adstra] Data."). It says nothing to prevent Kinesso from sharing the product with Acxiom. Thus, it is apparent that the primary concern of the contract is to permit the development of a product by Kinesso while preventing the resale of the Adstra Data for use in other projects. The Court's interpretation of the anti-assignment clause is consistent with those objectives; Adstra's interpretation is not.

Adstra seeks to draw significance from the fact that it considered Kinesso to be a non-competitor, while Acxiom was a competitor. But Adstra knew that it was dealing with a

subsidiary of IPG and that Kinesso and Acxiom were closely-related affiliates.  Dkt. No. 25 ¶ 7; Dkt. No. 150 ¶¶ 1–2; Dkt. No. 50 ¶ 4.  Here, IPG chose to take some of Kinesso's employees and functions and move them into Acxiom, necessitating assignment of the data to Acxiom.  *See* Dkt. No. 134-5 at 60:17–25, 67:5–20; Dkt. No. 102-16 at 47:23–48:3.  But there is nothing in the MDSA that would have prevented IPG from closing Acxiom's shop and housing its business in Kinesso, thereby making Kinesso a competitor.  *See* Dkt. No. 102-1 ¶¶ 17–18; Dkt No. 102-3 at 53:17–57:13.  Adstra's argument thus exalts form over substance.  It makes sense to read the anti-assignment provision to prevent a third party from obtaining rights against one or the other contract parties without that parties' consent.  It makes no sense to read it to give each party a veto right before the other sells its business to a successor or engages in any other internal corporate restructuring.

Indeed, it is Adstra's interpretation, and not Defendants', that would lead to absurd consequences.  The second sentence of the anti-assignment clause refers indistinguishably to a "successor" and an "affiliate."  A party need not obtain any further consent from its counterparty to either assignment—the necessary consent is provided in the MDSA itself.  But a "successor" is an entity who succeeds "to substantially all of the business or assets of such party's business unit to which this Agreement relates."  Dkt. No. 102-4 § 16.  Taking Adstra's interpretation to its logical but necessary conclusion, then, the MDSA would give either party a veto of the decision of the other party to sell all of its business to another.  The MDSA, by its terms, and without further action of the parties, is binding on "successors."  *Id.* § 16.  But, under Adstra's interpretation, were Kinesso's business sold or transferred to a successor, the successor would be bound by the terms of the MDSA but—absent Adstra's consent—would have no ability to terminate the MDSA.  It makes far more sense to read the MDSA as it is written.  The consent

that is necessary for assignment to a successor or affiliate is that provided in the MDSA itself. As long as a party makes an assignment to a successor or affiliate, no further consent is required and the assignment is effective.

Finally, because the MDSA unambiguously provides that it may be assigned to a corporate affiliate, there is no need to resort to extrinsic evidence. *See Greenfield*, 780 N.E.2d at 170 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide."). However, assuming such evidence were properly considered, it would further support Defendants' reading. "When a party to a contract conducts itself in a manner that might be probative of its interpretation of the contract 'for any considerable length of time before it becomes a subject of controversy,'" a court may afford this course of conduct significant weight. *Waterloo Cap. Partners, LLC v. BWX Ltd.*, 2022 WL 2063762, at *13 (S.D.N.Y. June 8, 2022) (quoting *Stone Key Partners LLC v. Monster Worldwide, Inc.*, 333 F. Supp. 3d 316, 324–35 (S.D.N.Y. 2018)). Prior to the onset of this litigation, Adstra acted as though it understood the assignment to be valid under the MDSA. Adstra's CEO and general counsel were informed of the assignment and non-renewal notice as soon as Acxiom sent the notice, Dkt. No. 134-2 at 78:23–79:20; Dkt. No. 137-36 at 63:5–12, and they raised no objection for approximately three months. During those months, Adstra and Acxiom discussed a new contract which was premised on the idea that the current license would not renew. Dkt. No. 103-14. Those discussions would make no sense unless Adstra understood, as the contract provides, that Kinesso was permitted to assign the agreement to Acxiom. Indeed, it was only *after* it became clear that neither Acxiom nor Kinesso wanted to replace the MDSA with an agreement of similar scope that Adstra raised an issue about the assignment—and then only apparently as a method to object to the non-renewal. There is no evidence Adstra raised

any competition or confidentiality concerns in the three months that negotiations were ongoing, contradicting its arguments that preventing assignment to Acxiom was crucial to maintaining its trade secrets.

Adstra tries to argue that Acxiom's actions in 2022 show that Acxiom believed assignment of the MDSA required consent. Dkt. No. 152 at 5–9. But Acxiom was not a party to the original MDSA, and its actions do not illustrate Kinesso's intent at the time of contracting. *See Newin Corp. v. Hartford Acc. & Indem. Co*., 467 N.E.2d 887, 889 (N.Y. 1984) ("[I]f the language of the policy is susceptible of two reasonable meanings, the parties may submit extrinsic evidence of their intent at the time of contracting"); *Fecteau v. Fecteau*, 949 N.Y.S.2d 511, 513 (3d Dep't 2012) (extrinsic evidence used to determine "the parties' intent at the time of contracting"). In any event, Acxiom's actions do not create a genuine issue that it believed consent was required for Kinesso to assign the MDSA to an affiliate. In early 2022, Acxiom told Adstra it would be taking the lead on data procurement and management within the IPG group. Dkt. No. 134-8. Adstra and Acxiom then discussed signing a new MDSA between Adstra and Acxiom, on similar but not identical terms to the Kinesso MDSA, and assigning the schedules of the old MDSA from Kinesso to Acxiom. Dkt. Nos. 103-1, 134-17. As Adstra notes, the parties acted as if Adstra's consent would be required for that transaction. *Id.* But that evidence does not support the notion that Acxiom believed that a mere assignment of the existing MDSA would require consent. The undisputed evidence is that Acxiom and Kinesso were suggesting rewriting the MDSA or assigning only the schedules but not the body of the agreement. Such action, to form a new contract, would have required consent. The fact that Acxiom correctly believed that it would need Adstra's consent before amending the terms of the MDSA does not give rise to the

inference that it believed that Adstra's consent would be needed to assign the agreement without any amendment.

Similarly, it does not create a genuine issue of fact that the new MDSA proposed by Acxiom inserted the word "other" to clarify that "any assignment" in the third sentence of the assignment clause did not apply to affiliate and successor assignments.  Dkt. No. 103-2 § 16.  A contract is ambiguous if it is "'capable of more than one meaning when viewed objectively by a reasonable person' who is cognizant of the trade practices, customs, and uses at issue and has examined the entire agreement."  *Thompson v. Mun. Credit Union*, 2022 WL 2717303, at *4 (S.D.N.Y. July 13, 2022) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)).  If a contract is not capable of more than one meaning when viewed in such a manner, the terms of another contract or proposal cannot change this fact. Thus, the fact that arguably clearer language is available or was proposed "does not automatically create ambiguity" in the contractual language actually used.  *Thompson*, 2022 WL 2717303, at *8.  It makes sense for Acxiom to suggest insertion of the word "other" as a clarification with the potential to avoid the type of litigation it faces here.  *Cf. United States v. Craft*, 535 U.S. 274, 287 (2002) (noting in the context of legislation that proposals may seek either to change the law or to clarify what the law already states).  However, this does not mean that Acxiom believed that the terms of the MDSA as written required consent for assignments to affiliates or successors or that the terms of the MDSA as written are ambiguous on this point.

Because the MDSA unambiguously provides that it may be assigned to an affiliate, and Acxiom is undisputedly an affiliate of Kinesso, the assignment of the MDSA from Kinesso to Acxiom in November 2023 was valid.  Acxiom had a license to use the Adstra Data consistent with the MDSA beginning in November 2023.  Dkt. No. 103-5.

## II.    Acxiom's Alleged Use of Data Prior to the Assignment

Defendants argue that the validity of the assignment requires the dismissal of all of Adstra's claims.  Dkt. No. 129 at 17–27.  However, Adstra makes a fallback argument that its claims remain viable because "Defendants had *already* incorporated the Adstra Data into Acxiom's Real ID, launching the project in October 2023," and therefore Acxiom was improperly using the data prior to the November 2023 assignment.  Dkt. No. 185 at 3. Adstra does not raise a genuine issue of material fact regarding whether such improper use occurred.

It is undisputed that Kinesso used the Adstra Data to create its KII product.  Dkt. No. 131 ¶ 21. That was an object of the MDSA.  It is also undisputed that in October 2023, Kinesso white-labeled its KII product to Acxiom, which rebranded it as "Real ID."  Dkt. No. 150 ¶ 25. That too was permitted by the agreement.  The MDSA vested property rights in the KII product in Kinesso and gave it the rights to convey that product to others.  Plaintiffs argue that the white-labelling creates the inference that Acxiom improperly used the Adstra Data in October 2023, prior to the assignment in November 2023.  Dkt. No. 185 at 3.  The conclusion does not follow from the premise.  Kinesso white-labeled the RealID product.  There is no evidence it conveyed the underlying data.  Defendants produce extensive evidence that neither the white-labeling of the graph nor even the eventual assignment changed how the parties were handling the data. Dkt. No. 134-16 at 37:2–13; Dkt. No. 134-1 at 41:3–7; Dkt. No. 102-16 at 47:23–48:3, 79:1–13; Dkt. No. 134-5 at 58:8–16.  The data continued to be stored at Kinesso and used by Kinesso engineers to develop the graph, and Acxiom employees did not access the data or work on the reference graph.  Dkt. No. 102-16 at 47:23–48:3, 73:2–74:8; Dkt. No. 134-1 at 41:3–7; Dkt. No. 134-5 at 60:17–25, 67:5–20; Dkt. No. 150 ¶ 49; Dkt. No. 104-15.  This only changed on May 1, 2024, when the KII team transitioned to Acxiom.  Dkt. No. 102-16 at 47:23–48:3; Dkt. No. 134-5 at 58:8–16, 60:17–25.  The undisputed evidence is that Adstra did not improperly use the data

prior to the November 2023 assignment, because it did not use the data at all.  It simply used the product provided to it by Kinesso.

"[W]hen confronted with evidence of facts that would support judgment in the defendant's favor as a matter of law, the plaintiff must come forward with evidence in admissible form that is capable of refuting those facts." *Newton v. Whole Foods Mkt.*, 2022 WL 4619111, at *3 (S.D.N.Y. Sept. 30, 2022) (citation omitted).  Plaintiff points to contemporaneous materials listing two Acxiom "resources" (i.e., employees) as part of the KII team and showing Veena Xavier, product manager for KII/RealID, making a presentation under the Acxiom name.  Dkt. No. 150 ¶ 30; *see* Dkt. Nos. 103-16; 104-8.  This evidence is insufficient to create a genuine issue of fact as to whether "Acxiom personnel built the Real ID referential graph."  Dkt. No. 150 ¶ 30.  Xavier clearly states that she was not employed by Acxiom prior to May 2024, but that Kinesso employees were "considered as contractors" for Acxiom and were given Acxiom emails to allow them to access Acxiom email and Slack channels.  Dkt. No. 134-5 at 113:2–8.  Adstra identifies no evidence to dispute that assertion.  The fact that a contractor created a product for a related company does not provide a basis to infer that the contractor was employed by that company.  Similarly, the possibility that two Acxiom "resources" were involved with the KII project to some extent is consistent with the idea that Acxiom used the product and the Kinesso employees were "considered as contractors," Dkt. No. 134-5 at 113:2–8, but the evidence is clear that the engineers working with the data and creating the product continued to be employed by Kinesso.  Dkt. No. 134-16 at 118:14–17; Dkt. No. 102-16 at 79:1.  Moreover, the contract specifically allows "vendors, contractors, or partners" working with Kinesso to access the data for use "on behalf of Client."  Dkt. No. 102-4 at 10.  Adstra has not provided a basis to infer that

prior to the assignment Acxiom was improperly using the Adstra Data, as opposed to simply

using the KII/RealID product which Kinesso continued to produce using the Adstra Data.

Plaintiff also suggests that even if Kinesso only provided Acxiom with the graph in

October 2023, this is itself improper because the graph contained the Adstra Data.  Dkt. No. 185

at 3–4 (citing Dkt. No. 102-4 § 9 ("Nothing contained in this Agreement shall be deemed to

convey . . . any ownership interest in or to the [Adstra] Data")).  This argument is meritless.  The

explicit purpose of the agreement is to allow Kinesso to develop "an Identity Resolution Client

Product for sale or license to Client's customers," Dkt. No. 102-4, Sch. A § 1.1, a purpose which

would be entirely foiled if Kinesso could not sell the graph.  The MDSA explicitly distinguishes

between the "Product developed by Client," which belongs to Client, and the data from which

the product "may be derived," which remains owned by Adstra.  Dkt. No. 102-4 at 10.  It states

that Adstra "shall have no right to . . . the underlying product or identity graph that may include

[Adstra] Data."  *Id.*  If the graph qualified as Adstra Data, Kinesso would not only be unable to

give it to Acxiom; it would be unable to give it to anyone, because doing so would breach the

confidentiality provisions of the MDSA.  The contract does not prevent Kinesso from selling the

product, as opposed to the Adstra Data, to Acxiom or any other customer.[11]

---

[11] Plaintiff argues further that although the agreement permits Kinesso to use the Adstra Data "in
the development of products . . . that may be sold or licensed to its customers," i.e. Kinesso's
customers, Dkt. No. 102-4 § 3.1, Kinesso violated the agreement by using the data to develop the
RealID product to be sold or licensed to Adstra's customers, Dkt. No. 185 at 5.  This is a
contorted and unworkable reading of the provision.  The relevant distinction in the MDSA is
between the data, which is owned by Adstra and cannot be sold, resold, sublicensed, or otherwise
provided to third parties, *id.* Sch. A § 1.1, and the product "derived from the ALC data," which is
the Client's "proprietary intellectual property" to which Adstra has "no right," *id.* at 10.  Kinesso
may sell or license its proprietary intellectual property to any customer, and here it provided it to
Acxiom.  It is not prevented from doing so simply because it knows or believes that Acxiom or
any other customer may resell the product.  Such a nebulous restriction on alienability cannot be
implied from the word "its" when the contract explicitly states that Adstra has "no right" over
Kinesso's use of the product.  *Id.*

Kinesso's use of the Adstra Data to develop its KII product was clearly within the permitted scope of the MDSA. Between the time that the product was white-labeled to Acxiom in October 2023 and the assignment of the MDSA to Acxiom in November 2023, Kinesso's use of the data did not change, and Acxiom did not gain access to the data. The fact that Kinesso allowed Acxiom to use its product, as the MDSA permitted, does not raise a genuine dispute as to the separate issue of whether Acxiom improperly used or possessed the Adstra Data.

## III.  Plaintiff's Claims

The Court's conclusion that Acxiom did not improperly use or possess the Adstra Data before the assignment, and that the assignment was valid substantially resolves all of Plaintiff's claims.

### A.  Breach of Contract (Counts IV, V, VI, VIII, IX, and X)

To prove a claim for breach of contract under New York law, plaintiff must show: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 616 (S.D.N.Y. 2024) (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc*., 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011)). "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (quoting *1–10 Indus. Assocs., LLC v. Trim Corp. of Am*., 297 A.D.2d 630, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)). "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties," and "[n]o obligation can be implied . . . which would be inconsistent with other terms of the agreement of the parties." *Murphy v. Am. Home Prods. Corp*., 448 N.E.2d 86, 91 (1983). Under New York law, the doctrine simply "reads into a contract a term that is not expressed but is necessary to give the

agreement meaning and to prevent it from being illusory." *Scottsdale Ins. Co. v. McGrath*, 549

F.Supp.3d 334, 353 n.6 (S.D.N.Y. July 19, 2021).

### 1.    The MDSA

Count IV of Plaintiff's amended complaint alleges that Kinesso breached the MDSA by

"purporting to assign the MDSA to Acxiom without consent," "using the [Adstra] Data in a

manner . . . that exceeds the scope of the license provided in the MDSA," breaching

confidentiality, and failing to make contractual payments.  Dkt. No. 39 ¶¶ 176–184.  It also

alleges in the alternative that if the assignment is valid, Acxiom breached the MDSA by using

the [Adstra] Data in a manner than exceeds the scope of the license provided in the MDSA.  *Id.*

¶ 183.  Counts VIII and IX of Plaintiff's amended complaint allege that Acxiom and Kinesso

breached the covenant of good faith and fair dealing inherent in the MDSA by "taking actions

that allowed Acxiom, a direct competitor of Adstra, access to the ALC Data in order to directly

compete with Adstra."  Dkt. No. 39 ¶ 214; *see id.* ¶ 222.

Almost all of these issues are fully resolved by the discussion above.  The assignment to

Acxiom was valid and did not breach the MDSA.  Since the assignment was valid, Acxiom had

the right to terminate the MDSA, the notice of termination issued by Acxiom was valid, and

Adstra was not entitled to payments on the contract beyond February 2024.[12]  Kinesso and

Acxiom also did not use the data beyond the scope of the MDSA by creating the referential

graph which was white-labeled to Acxiom.  As stated above, the MDSA explicitly provided that

Kinesso could use the data to develop "an Identity Resolution Client Product for sale or license

to Client's customers."  Dkt. No. 102-4, Sch. A § 1.1.  This is what Kinesso did, and although

Adstra objects to Kinesso providing the product to Acxiom, the MDSA contains no language

---

[12] There is no dispute that Kinesso made payments until the agreement terminated.  *See* Dkt. No.
152 at 28 ("Kinesso has not paid its licensing fees under the MDSA since February 29, 2024.").

preventing this.  There is also no breach of the confidentiality provision, because Kinesso did not

disclose the data, only the product.  *See* Dkt. No. 102-4 § 8.1 (defining "Confidential

Information" to include the Adstra Data); *id.* Sch. A. § 1 (explicitly allowing Kinesso to sell or

license the product developed using the Adstra Data).

Kinesso also did not violate the covenant of good fair and fair dealing inherent in the

agreement by assigning the agreement to Acxiom or using the data to build a product for

Acxiom.  A restriction on assignment to Acxiom is not "necessary to give the agreement

meaning" or ensure that Adstra receives the benefit of its bargain.  *Scottsdale Ins. Co.*, 549

F.Supp.3d at 353 n.6.  There is no non-compete clause in the MDSA.  The MDSA explicitly

permits assignment to affiliates, and Acxiom was well aware that Kinesso and Acxiom were

affiliates.  Preventing assignment to Kinesso's affiliate Acxiom would be inconsistent with the

agreement.  *See Murphy*, 448 N.E.2d at 91 ("No obligation can be implied . . . which would be

inconsistent with other terms of the agreement of the parties.").  The conduct identified by

Adstra also does not constitute bad faith.  *See Tractebel*, 487 F.3d at 98.  Kinesso had the right

under the MDSA to assign the agreement to an affiliate, and moreover did so as part of the exact

type of corporate reorganization the assignment provision seems to contemplate.  Adstra

obtained the full benefit of its bargain, as it received the full license fee under the contract.  The

Court cannot rewrite the agreement of the parties based on Adstra's post hoc concerns about

competition.[13]

---

[13] Plaintiff also alleges that if the assignment is deemed effective, Acxiom breached the covenant
of good faith and fair dealing.  Dkt. No. 39 ¶ 214.  However, the covenant of good faith and fair
dealing does not prevent Acxiom from competing with Adstra or from taking an assignment
expressly permitted by the MDSA.  *See Cambridge Cap.*, 565 F. Supp. 3d at 456 ("Absent a
connection to an express or presumed contractual right or obligation, the doctrine 'does not
import a generalized code of good conduct into the law of contracts.'" (quoting *Scottsdale*, 549
F.Supp.3d at 353 n.6)).

Plaintiff's only argument regarding the MDSA which has not already been resolved is the argument that Kinesso breached the MDSA by "engaging, along with Acxiom, in . . . comparative analysis of the Adstra Data." Dkt. No. 105 at 20; Dkt. No. 152 at 2, 24–25. This argument relies on Section 9 of the MDSA, which prohibits the use of the Adstra Data "for purposes of benchmarking or other comparative analysis." Dkt. No. 102-4 § 9. Adstra argues that Defendants violated these provisions between July and September 2023 by "conduct[ing] analyses of the Adstra Data comparing it to other sources in Kii in order to determine the impact of terminating the MDSA." Dkt. No. 152 at 24. Defendants argue that Kinesso did not conduct a "comparative analysis" within the meaning of the MDSA, and that Adstra cannot show damages.[14] Defendants are correct.

The phrase "comparative analysis" is imprecise in isolation, but gains meaning from the company it keeps. *See Pfizer, Inc v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67 (2d Cir. 2022) ("Noscitur a sociis refers to the rule that 'an ambiguous term may be given more precise content by the neighboring words with which it is associated.'" (quoting *United States v. Stevens*, 559 U.S. 460, 474 (2010))). The MDSA prohibits using the Adstra for "benchmarking or other

---

[14] Defendant also argues that this theory of breach should not be considered because it was not alleged in Astra's amended complaint. Dkt. No. 190 at 11; *see Greenidge v. Allstate Ins. Co.*, 312 F. Supp. 2d 430, 436–37 (S.D.N.Y. 2004) ("A party cannot assert a cause of action for the first time in response to a summary judgment motion . . . [b]ecause a claim so raised deprives the adversary of the opportunity for discovery and presumptively creates prejudice.") *aff'd*, 446 F.3d 356 (2d Cir. 2006). However, the amended complaint includes the relevant language from the MDSA and states that Kinesso has breached the MDSA by using the Adstra data in a manner outside the scope of the MDSA. Dkt. No. 39 ¶¶ 38, 180. The submissions of the parties show that they have had an adequate opportunity in discovery to address the issue whether Kinesso acted outside the scope specifically by engaging in comparative analysis. *See* Dkt. No. 120-2 at 74–76 (examining Plaintiff's expert on his understanding of "comparative analysis"); Dkt. No. 170 ¶ 6 & n.4 (citing deposition testimony from an Acxiom executive regarding whether the analysis conducted compared one data set against another); Dkt. No. 173-1 at 144:15–22 (deposition testimony regarding whether Xavier compared one data source against another). The Court will therefore consider the issue on the merits.

comparative analysis." Dkt. No. 102-4 § 9. The provision on "benchmarking or other comparative analysis" is also part of a list that states Client shall not "reverse engineer, disassemble, decompile, or attempt to derive the underlying source code," and shall not "use the [Adstra] Data to develop any product or service expressly prohibited." Dkt. No. 102-4 § 9. The overall concern is misappropriation of the Adstra data for commercial benefit outside of the permitted use to create an identity resolution product. In computing, benchmarking is "[a] test designed to evaluate or compare the performance of hardware or software; a piece of software, a data set, etc., designed or used for this purpose." Benchmarking 2.b., Oxford English Dictionary, https://www.oed.com/dictionary/benchmark_n?tl=true. Using the Adstra Data for benchmarking would mean using it as the standard to measure the performance of other data or algorithms. Similarly, each of the other terms relates to the use of the Adstra Data for some purpose other than the purpose of generating the permitted product. By parity of analysis, "comparative analysis" is not just any comparison of the Adstra Data to some other data, but, at a minimum, a comparison for use outside of the creation of the identity resolution product.

The term "comparative analysis" cannot be understood to prohibit use that is necessary to create the identity resolution product itself. The entire purpose of the agreement is for Kinesso to "develop an Identity Resolution Client Product for sale or license to Client's customers" Dkt. No. 102-4 § 1.1. That is the reason Kinesso was licensing Adstra's data. "Comparative analysis" thus cannot include comparing one version of the referential graph product to another version of the referential graph product to determine which is better, because without this analysis Kinesso could not develop the product. Indeed, Plaintiff's technical expert contrasted "comparative analysis" which occurs outside of the graph-building process from the testing and analysis necessary to build the graph. *Id.* at 83:14–24. "Comparative analysis" also cannot be

understood to prohibit Kinesso from engaging in comparative shopping to determine what sources of data would be most useful to it and whether to renew the agreement. The MDSA was term-limited and explicitly contemplated that the parties would decide each year whether to renew. *Id.* Sch. A § 2.1. It also explicitly contemplated that that Kinesso would use more than one source of data to develop the product. Dkt. No. 102-4 § 1.1. It follow then that "comparative analysis" cannot be read to prohibit Kinesso from examining the Adstra data and also examining the other data in its possession or available to it and from considering whether, in light of the data available to it and the contribution of the Adstra data to its product, it would make sense to renew and to continue to pay a fee to Adstra.

Therefore, "conduct[ing] analyses of the Adstra Data comparing it to other sources in Kii in order to determine the impact of terminating the MDSA," Dkt. No. 152 at 24, cannot constitute "comparative analysis" as that term is used in the MDSA. Thomas asked Xavier to identify the "unique contribution of Adstra," to the graph, the value of the Adstra data to the graph, and "who Adstra overlaps with the most." Dkt. No. 103-10. Xavier responded that "that "[i]n comparison with our largest sources to the graph, i.e. duncan006, there is a very small over-lap with Adstra," that the value of the Adstra Data to the graph build was low, and that the data was mainly valuable to build the crosswalks. Dkt. No. 103-11. Xavier also attached a spreadsheet that seems to be comparing the "occupancies" of Adstra and duncan006. *Id.* at 11. The comparisons made by Xavier were explicitly aimed at determining the contribution of the Adstra data to the graph and whether it was worth renewing the MDSA. This is not "comparative analysis" under the MDSA.

Plaintiff's expert testifies that although building and testing the referential graph is not "comparative analysis," he understands Xavier's work to be "comparative analysis" because

Xavier compared Adstra to duncan006.  Dkt. No. 102-2 ¶ 62.  But the expert's testimony does not create a genuine issue of fact if the MDSA is properly interpreted, because the comparisons involving duncan006 were simply part of determining what the Adstra Data was contributing to the product.  Xavier testifies that "[o]ccupancies are . . . what makes the graph," and her analysis involved "comparing the source to the graph," not comparing "one data source to another data source," Dkt. No. 173-1 at 144:15–22.  An Acxiom executive similarly states that this analysis involved comparing different versions of the graph.  Dkt. No. 134-1 at 140:24–141:8.  Xavier did not misappropriate the Adstra data to conduct some analysis external to what was necessary to build the referential graph product and determine the contribution of the Adstra data to that product.  The comparisons were made explicitly to determine what the Adstra data was contributing to the product, and Adstra has not argued that the analysis involving duncan006 would be useful for any other purpose.

Moreover, even assuming that comparing the Adstra Data to duncan006 was a forbidden "comparative analysis," Adstra has shown no damages from this purported breach.  "It is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach—i.e., where the transaction would have failed, and the damage would have been suffered, even if no breach occurred."  *Pesa v. Yoma Dev. Grp., Inc.*, 965 N.E.2d 228, 231 (N.Y. 2012); *see Maricultura Del Norte, S. de R.L. de C.V. v. Umami Sustainable Seafood, Inc.*, 769 F. App'x 44, 53 (2d Cir. 2019).  Although Plaintiff's rhetoric associates "comparative analysis" with "terminating the MDSA," Dkt. No. 152 at 24, Acxiom did not terminate the contract because of a comparison Kinesso ran with duncan006.  Acxiom terminated the contract because the Adstra Data had low value to the graph build for its price.  Dkt. No. 150 ¶ 24; *see* Dkt. Nos. 104-7, 103-17, 103-18, 103-19, 134-26.  Kinesso's focus was not on duncan006 per se,

but on the contribution of the Adstra Data to the graph build.  Dkt. Nos. 103-10, 103-11; Dkt.

No. 173-1 at 144:15-22; Dkt. No. 134-1 at 140:24-141:8.  Plaintiff has not made any serious

argument that Kinesso was forbidden by the MDSA from determining whether the Adstra Data

contributed to the graph.  Kinesso would have made that determination with or without the

duncan006 analysis, and Plaintiff has not suggested any damages from the duncan006 analysis

other than the non-renewal of the MDSA.  Summary judgment must be granted for Defendants

on all Plaintiff's claims for breach of the MDSA.

### 2.    The DPA and DPEA

Counts V and VI of Plaintiff's amended complaint allege that Acxiom breached the DPA

and DPEA.  Dkt. No. 39 ¶¶ 185–198.  Each count alleges that Acxiom was provided with data

under the relevant agreement and used the data in a manner inconsistent with the terms.  *Id.*

¶¶ 190–191, 196–197.  However, Plaintiff has not introduced any evidence Acxiom actually

misused data provided to it under the DPA or DPEA.  Rather, Plaintiff suggests these agreements

were breached by Acxiom's use of data it received under the MDSA, a topic the DPA and DPEA

simply do not cover.

The DPA was signed in 2021, and expressly states it is being provided "in connection

with the Jobs and Partner described above," namely, "the processing of Adstra historical name

and address matching repository to standardize the name and address fields to match the Acxiom

file layouts."  Dkt. No. 102-11.  The DPA states that "[f]rom time-to-time Client may prepare

and provide Processor with Client Data (hereinafter 'Data'), which includes Adstra Data it has

licensed for use by Processor to provide services to the Partner."  *Id.*  To the extent that this

definition suggests Data is something provided by Kinesso to Acxiom "from time to time," this

suggests a focus on data provided periodically by Kinesso for processing, not data which

Acxiom might receive wholesale in a future contract or assignment.  The permitted use of data

under this agreement was of extremely limited scope, as would be expected for a simple data

processing job. Dkt. No. 102-11. The agreement gives no indication that either party intended

the limited scope of use under the DPA to apply to all Adstra data Acxiom might ever receive,

and such a result would clearly be "contrary to the reasonable expectations of the parties."

*Landmark Ventures, Inc. v. Wave Sys. Corp.*, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012)

(quoting *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 561 (1st Dep't 2003)).

The DPEA was signed in 2022 and explicitly defines the covered data as a particular file

to be provided by Adstra for evaluation purposes. Dkt. No. 102-12 Attachment 1. The

restrictions contained within the DPEA relate to the limited use of the data for determining "the

acceptability of the Data and whether Acxiom has an interest in further licensing or purchasing"

the Data. *Id.* § 2. Such restrictions obviously would not apply to data which Acxiom later

purchased or otherwise independently obtained, including the MDSA data. The DPA and DPEA

were limited-scope agreements which cannot be read to restrict Acxiom's use of Adstra data it

acquired in other manners and for other purposes. Defendant therefore is entitled to summary

judgment on Counts V and VI.

Count X of Plaintiff's amended complaint alleges breach of the covenant of good faith

and fair dealing in the DPA. Dkt. No. 39 ¶¶ 226–233. Plaintiff states that Acxiom breached this

covenant by taking "surreptitious actions" to access the Adstra Data "in order to build a product

that competes with Acxiom." *Id.* ¶ 231. As stated above, Plaintiff has produced no evidence that

Acxiom misused the data it acquired pursuant to the DPA, and the DPA cannot be read to govern

Acxiom's duties with regard to other data Acxiom properly obtained. Defendant therefore is

also entitled to summary judgment on Count X.

**B.        Misappropriation of Trade Secrets (Counts I and II)**

Counts I and II of the amended complaint allege that Defendants misappropriated

Adstra's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1839, and

New York common law.  Dkt. No. 39 ¶¶ 143–170.  The elements of a claim under the DTSA and

New York law are "fundamentally the same," and "district courts often rely on cases discussing

misappropriation under New York law to analyze DTSA claims."  *Iacovacci v. Brevet Holdings,*

*LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (quoting *ExpertConnect, LLC v. Fowler*, 2019

WL 3004161, at *4 n.1 (S.D.N.Y. July 10, 2019)).  The elements of trade secret

misappropriation under New York law are 1) that Plaintiff "possessed a trade secret," and 2) that

Defendant "used that trade secret in breach of an agreement, confidential relationship or duty, or

as a result of discovery by improper means."  *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38,

43–44 (2d Cir. 1999); *see* 18 U.S.C. § 1832(3) (creating a cause of action for receipt or

possession of a trade secret "knowing the same to have been stolen or appropriated, obtained, or

converted without authorization").  The Restatement of Torts describes "improper means" as

including unlawful conduct, "fraudulent misrepresentations, tapping of telephone wires,

eavesdropping or other espionage" and "means which fall below the generally accepted

standards of commercial morality and reasonable conduct."  Restatement (First) of Torts § 757

(1939); *see Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 255

(S.D.N.Y. 2021).  The DTSA defines "improper means" to include "theft, bribery,

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy," but

specifically not to include "any other lawful means of acquisition."  18 U.S.C. § 1839(6).

Acxiom did not acquire the Adstra Data by improper means; it acquired the data through

a permitted assignment from Kinesso.  This fact alone is fatal to Adstra's trade secret claims.  A

party cannot misappropriate information it is lawfully provided via contract.  *See PRCM*

*Advisers LLC v. Two Harbors Inv. Corp.*, 2021 WL 2582132, at *15 (S.D.N.Y. June 23, 2021) ("[T]he DTSA claim is inapplicable during the term of the Management Agreement when Two Harbors had a contractual right to use PRCM's intellectual property."); *TransPerfect Glob., Inc. v. Lionbridge Techs., Inc*., 2022 WL 195836 (S.D.N.Y. Jan. 21, 2022) ("TransPerfect has failed to show that the Defendants acquired trade secrets through improper means," because "[t]he Agreement explicitly permitted H.I.G. and its representatives to access Evaluation Material."). *aff'd*,2024 WL 177726 (2d Cir. Jan. 17, 2024). Therefore, the Court need not consider whether the Adstra Data is a trade secret or whether Acxiom used it to obtain an economic benefit. *See* Dkt. No. 129 at 23–24; Dkt. No. 152 at 19–21.

### C.    Unfair Competition (Count III)

Count III of the amended complaint alleges that Defendants unfairly competed with Adstra under New York law by misappropriating Adstra's confidential information and using it to compete against Adstra. Dkt. No. 39 ¶¶ 171–175. The tort of unfair competition under New York law is a "flexible one," but the "cornerstone of the tort" is "misappropriation of another's commercial advantage." *Ruder & Finn Inc. v. Seaboard Sur. Co*., 422 N.E.2d 518, 522 (N.Y. 1981); *see also ITC Ltd. v. Punchgini, Inc*., 880 N.E.2d 852, 857–860 (N.Y. 2007) (applying the tort to misuse of a Plaintiff's name or mark); *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc*., 672 F.2d 1095, 1105 (2d Cir. 1982) ("An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property."). No misappropriation occurred here, because the assignment was proper and Acxiom did not access the data prior to the assignment. *See Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co*., 1 F. Supp. 3d 224, 275–76 (S.D.N.Y. 2014) (dismissing unfair competition claim when "sharing information about Big Vision between divisions at DuPont did not constitute a breach of contract or

48

misappropriation of a trade secret"), *aff'd sub nom. Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015).

### D.    Tortious Interference with Contract (Count VII)

Count VII ofhe amended complaint alleges that Acxiom tortiously interfered with the MDSA by "pressuring Kinesso to sign a purported assignment agreement" which would constitute a breach of the MDSA.  Dkt. No. 39 ¶¶ 199–207.  "Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996).  Because there was no breach of contract, summary judgment must be granted for Defendants on the tortious interference claim.  *Id.* at 1376; *see NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 495–98 (N.Y. 1996).

## CONCLUSION

Defendants' motion for summary judgment, Dkt. No. 218, is GRANTED.  Plaintiff's motion for partial summary judgment, Dkt. No. 107, is DENIED.

Plaintiff's motion for reconsideration, Dkt. No. 88, is DENIED.  Defendants' motion to dismiss, Dkt. No. 44, Plaintiff's motion to preclude expert reports and testimony, Dkt. No. 133, Defendant's motions to preclude expert reports and testimony, Dkt. Nos. 117, 122, and Plaintiff's letter motion to compel unredaction, Dkt. No. 200, are DENIED as moot.

The Clerk of Court is respectfully directed to close Dkt. Nos. 44, 88, 107, 117, 122, 133, 200, and 218, enter judgment for Defendants, and close this case.

SO ORDERED.

Dated: February 19, 2025
New York, New York

_____
LEWIS J. LIMAN
United States District Judge